H: H. ROBERTSON CO. v. KLAUER MFG. CO.

KLAUER MFG. CO. v. H. H. ROBERT-SON CO.

Nos. 11074, 11075.

Circuit Court of Appeals, Eighth Circuit.

July 1, 1938.

Rehearing Denied Aug. 11, 1938.

William B. Kerkam, of Washington, D. C. (Gordon W. Daisley, of Washington, D. C., and Henry C. Kenline, of Dubuque, Iowa, on the brief), for H. H. Robertson Co.

Roberts B. Larson, of Washington, D. C. (Jennings Bailey, Jr., and Francis D. Stephens, both of Washington, D. C., on the brief), for Klauer Mfg. Co.

Before STONE, WOODROUGH, and BOOTH, Circuit Judges.

STONE, Circuit Judge.

This is an action for infringement of Young and Gephart patent No. 1,589,581 (application, December 28, 1922; issue, June 22, 1926), covering a "ventilator", brought against the assignee of the patent. The trial court determined that the patent was valid but not infringed. From that portion of the decree determining non-infringement the plaintiff appeals. From those portions of the decree determining validity of the patent and equal division of costs defendant brings a cross-appeal.

The General Art. The broad art involved is that of ventilators which are placed on roofs of mills, foundries, shops and other buildings for the purpose of removing gases, fumes, odors, etc., from the interiors. Ventilators divide into several classes depending upon the various basic principles of operation—such as fan, rotary, siphon, plain and combinations thereof. The immediate class, within which this patent falls, is the "plain stationary" type. This means a ventilator which does not have a fan, does not rotate with the outside wind and does not siphon.[1] In short, it is the kind of ventilator which depends entirely upon the utilization of the outside air or wind for its action.

The action of such ventilators depends upon or is influenced by various considerations—such as temperature (inside and outside of building), height of the ventilator, wind velocity, wind direction, outside weather conditions and slope of roof. The purpose of the ventilator is not only to prevent retardation of the natural exit flow of inside air but to accentuate such flow—to create an artificial draft. The problem is to meet the above conditions so as to minimize those which are adverse to creation of a draft and to accentuate the effect of those which are susceptible of utilization to create a draft. Since many of these considerations are inconstants (such as wind direction, wind velocity and weather conditions), the ideal ventilator is one which will provide a dependable draft under all conditions, both normal and predictable abnormal. Business economy in manufacture and in sale make highly desirable a relatively short stack and also a single type which can be used on all kinds of roofs. In short, the perfect ventilator is one which is commercially feasible and which, under all conditions, may be depended upon to provide a sufficiently accentuated draft and one where the results can be fairly well predicted or measured.

In the practical construction of a ventilator, two opposed forces are encountered—outside air movement (direction and velocity of wind) and weather (precipitation of moisture, such as rain, sleet and snow). The wind is to be turned to good use while the weather is to be kept from entering the building through the ventilator.

The Patent. The patent contains five claims upon a single construction. Claims 1 and 5 are involved here. The only difference between these claims is that claim 1 has an additional element, the so-called "lip" at the outer edge of the eduction pipe. We choose to consider claim 5 (the broader claim) in examining and determining validity and infringement, with such statements as to claim 1 as may be necessary or helpful.

Claim 5 is as follows:

"5. A ventilator comprising an eduction pipe, a cap member located above said eduction pipe and separated therefrom a substantial distance, and a storm band of materially greater diameter than said eduction pipe surrounding the latter, said eduction pipe, cap member and storm band being constructed and arranged to have the lower end of the storm band extended below the top of the eduction pipe to prevent horizontally flowing air currents from entering the ventilator at the bottom thereof, and to have the upper end of the storm band extended above the lower edge of the cap member to prevent horizontally flowing air currents from entering the ventilator at its top and yet leave a substantial space between the lower edge of the cap member and a plane tangential to the upper edges of the storm band and eduction pipe and intersecting the longitudinal axis of the latter, to form a direct passage of substantial width from the eduction pipe to the atmosphere in the absence of obstructions therein, means for obstructing said direct passage to prevent the entrance of rain into the eduction pipe, and means co-operating with the storm band and eduction pipe to deflect to the outside of said storm band upwardly inclined flowing air currents."

---

[1] The siphon type is defined as one wherein outside wind is permitted or directed into the ventilator with the idea of creating a so-called siphon action upon the air inside the building.

A vertical section of this construction is shown in Fig. 2 following (unnecessary numerals being omitted).

FIG. 2.

Reading the claim on the drawing, the eduction pipe is 10, the cap is 12, the storm band is 13, the "means * * * to prevent entrance of rain into the eduction pipe"—also called a "weather baffle"—is 27, and the "means co-operating with the storm band and eduction pipe to deflect to the outside of said storm band upwardly inclined flowing air currents"—also called a "deflecting band" and a "baffle ring" —is 25. The "lip" covered in claim 1 is 30.

### Validity.

The cross-appellant attacks the validity of the patent upon several grounds as follows:

(1) Because of the admission of one of the patentees that a ventilator having every element of claim 3 was known to him before the application was filed; (2) because based on new matter introduced during progress through the Patent Office; (3) because the claims here are vague and indefinite; (4) because of the prior art— this patent being but an aggregation of elements old in the art.

■ (1) Fraudulent Claim. In the state of the record here this issue is not open to cross-appellant. The pleadings present no such issue. The case was tried under a stipulation, a portion of which is:

"For the purpose of simplifying the issues herein and the work of the Court and counsel, plaintiff will stand on claims 1 and 5 only of patent in suit No. 1,589,581, and defendant will rely for proof of anticipation or prior invention of the invention of said two claims upon the following patents and publications only of those set forth in paragraph 14 of the answer herein."

This matter first appears during the examination of one of the patentees when the cross-appellant sought to introduce that issue and was denied by the court.

■ (2) New Matter. The new matter asserted to have been introduced during the progress of the patent through the Patent Office and which is claimed to have broadened the disclosure in the application has no such broadening effect. This matter consisted of adding to the drawing (Fig. 2) and in adding to the specifications. The additions to the drawing were the lines and numerals 41 and 42 shown on Fig. 2, hereinbefore set out. The additions to the specifications[2] were for the purposes of clarity and definiteness and had that effect. Such additions are per-

---

[2] These specification additions are as follows:

"It is desirable that the direct passage from the eduction pipe 10 to the atmosphere in the absence of obstructions, should be as wide as possible while providing against the entrance of air into the ventilator at its top and also providing against the entrance of rain into the eduction pipe.

"For the first purpose, to-wit: to obtain a direct passage of maximum width between the cap member and the storm band while providing against the passage of air into the ventilator at the top, the storm band 13 and cap member 12 are constructed and arranged with relation to each other and to the eduction pipe so that the storm band extends above the lower edge of the cap member a sufficient distance to prevent air currents flowing over the upper edge of the storm band from passing down into the ventilator, and the cap member is of such size or diameter and is positioned with relation to the storm band and the eduction pipe so that its lower edge is separated a substantial distance from an inclined plane tangential to the upper edges of the storm band 13 and eduction pipe 10 and intersecting the longitudinal axis 40 of the latter, which inclined plane is represented by the full line 41 in Fig. 2.

"The width of the direct passage in the-

missible. Hobbs v. Beach, 180 U.S. 383, 386, 21 S.Ct. 409, 45 L.Ed. 586; Insulite Co. v. Reserve Supply Co., 8 Cir., 60 F. 2d 433, 435; In re Curtis, Cust. & Pat. App., 81 F.2d 236, 238; General Elec. Co. v. Cooper Hewitt Elec. Co., 6 Cir., 249 F. 61, 64, certiorari denied 246 U.S. 668, 38 S.Ct. 336, 62 L.Ed. 930; Boyce v. Stewart-Warner Speedometer Corp., 2 Cir., 220 F. 118, 124; Western Elec. Co. v. Sperry Elec. Co., 7 Cir., 58 F. 186, 196.

■■■ (3) Claims vague and indefinite. This attack is aimed at the statement in the claims describing the space between the lower edge of the cap and the upper edge of the storm band. The particular language is the italicized words in the following:

"A ventilator comprising an eduction pipe, a cap member located above said eduction pipe and separated therefrom a substantial distance, and a storm band of materially greater diameter than said eduction pipe surrounding the latter, said eduction pipe, cap member and storm band being constructed and arranged to have the lower end of the storm band extended below the top of the eduction pipe to prevent horizontally flowing air currents from entering the ventilator at the bottom thereof, and to have the upper end of the storm band extended above the lower edge of the cap member to prevent horizontally flowing air currents from entering the ventilator at its top and yet leave a *substantial space* between the lower edge of the cap member and a plane tangential to the upper edges of the storm band and eduction pipe and intersecting the longitudinal axis of the latter, to form a direct passage of substantial width from the eduction pipe to the atmosphere in the absence of obstructions therein."

The argument is that the patent does not define "substantial" or "substantial space" so that such space could be ascertained therefrom by one skilled in the art. While the statute (35 U.S.C.A. § 33) requires "such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make, construct, compound, and use the same" yet "A limited use of terms of effect or result, which accurately define the essential qualities of a product to one skilled in the art, may in some instances be permissible and even desirable." General Elec. Co. v. Wabash Appliance Corp., 58 S.Ct. 899, 903, 82 L. Ed. ——, May 16, 1938. Here the space is hardly capable of mathematical determination and definition since that space is largely dependent upon the relativity of the eduction pipe, the storm band and the cap and such relativity must be applied to ventilators of varying sizes. None the less, the drawing (Fig. 2) and the specifications indicate the thought by the lines 21, 41 and 42 and the specifications (p. 2, ll. 120-128) further explain the thought by relative measurements as follows:

"In practice a highly efficient ventilator has been made in which the storm band 13 has a diameter equal to 1.92 of the diameter of the eduction pipe, and the lower edge or rim of the cap member has a diameter equal to 1.33 of the diameter of the eduction pipe and is separated from the latter by a distance which is equal to .584 of the diameter of the eduction pipe.

"While it may be preferred to maintain this relation between the size of the storm band and cap member to the eduction pipe, it is not desired to limit the invention in this respect."

Such disclosures are sufficient.

■■■ (4) Prior Art—Aggregation. The

ventilator illustrated in Fig. 2 is represented by the distance between the inclined plane 41 and an inclined plane 42 tangential to the lower edge of the cap member 12 and intersecting the longitudinal axis of the eduction pipe 10 at the point where said axis is intersected by the plane 41." (Patent, p. 1, ll. 70-102, and p. 2, ll. 1-5.)

"It is desirable that the baffle ring 27 should function to prevent the rain entering the eduction pipe with the least possible diversion from a direct path of the gases flowing out of the eduction pipe, and this is accomplished as herein shown by making the baffle ring of substantially the diameter of the lower edge of the cap

member and locating the same so that its lower edge projects slightly beyond the plane 41.

"By reference to Fig. 2, it will be seen that the baffle ring 27 while effectively preventing the entrance of rain into the eduction pipe, projects a minimum amount beyond one side limit of the direct path, to-wit: the plane 41, and thereby causes a minimum diversion of the outflowing gases from said direct path, so that the efficiency of the ventilator is but slightly reduced below the maximum by the presence of the device which excludes the rain." (Patent, p. 2, ll. 76-96.)

patented structure, under claim 5, is made up of five elements: Eduction pipe, storm band, cap, weather baffle, and baffle ring (around the pipe). Each of these has its separate function or functions but such function is useful only because it supplies a need in the entire unitary structure. Some have to do with weather, the others with wind, some with both weather and wind. The eduction pipe is the basic element for the usefulness or the protection of which all other elements exist. The cap functions as the main protection of the pipe from weather and also as preventing downward inclined and, to an extent, horizontal winds coming over the top of the storm band from entering the ventilator. The weather baffle functions as a further weather protection, shielding from rain or snow driving between the cap and the upper edge of the storm band. The storm band is primarily a protection against horizontal winds entering the ventilator and, possibly, secondarily some protection against weather. The baffle ring is a protection against upwardly inclined winds entering the ventilator. These are the elements and the functions of each. Obviously, each element is sized, formed and positioned in particular relation to all or some of the other elements and none can fulfil its mission alone. The usefulness of each arises from and depends upon its co-action with other elements.[3]

It is not disputed that each of these five elements—also this is true of the "lip" —is found in the prior art. They are found in various combinations with each other[4] but never are all five (or, including the "lip", all six) found together. In this state of the art, it is evident that no one citation can anticipate. Anticipation must be sought, if at all, in this patent being only an aggregation of elements scattered through the prior art in various smaller combinations.

There is no dispute that a mere aggregation of old elements creates noth-

[3] The "lip" (Fig. 2, 30), not in claim 5 but in claim 1, acts as a slight further protection from such wind as may enter from the bottom exerting a direct effect at the top of the pipe.

[4] Appellee has appended to its brief an "Element chart" setting forth the six elements (including the "lip") as found in twenty-four earlier revelations. While we think the chart is not entirely accurate, it is useful as a concise diagrammatic picture of the prior art. The chart (with our addition of the word "Chimney" to denote patents of that character) is as follows:

"ELEMENT CHART.

| 6. Means for Keeping Wind Out of Ventilator from Below. | 5. Rain Baffle. | 4. Storm Band. | 3. Cap Member. | 2. Lip. | 1. Education Pipe. | |
|---|---|---|---|---|---|---|
| x |   | x | x |   | x | Day, 297,972 (Chimney) |
|   | x | x | x | x | x | Warden, 925,252 |
| x |   | x | x |   | x | Kennard, 152,647 (Chimney) |
|   | x | x | x |   | x | Keane, 483,384 (Chimney) |
|   |   | x | x | x | x | British, 10,047 (Partial Chimney) |
| x |   | x | x | x | x | German, 15,921 (Chimney) |
|   | x | x | x | x | x | Bureau of Standards |
|   | x | x | x | x | x | Burt Ventilator |
|   | x | x | x | x | x | Klauer Catalog |
|   | x | x | x | x | x | Shodron, 1,270,879 |
|   | x | x | x |   | x | Jardine, 796,914 |
|   |   | x | x |   | x | British, 4,418 (Chimney) |
|   |   | x | x |   | x | French, 534,378 (Chimney) |
|   |   | x | x | x | x | Maranville, 1,247,698 |
|   | x | x | x |   | x | Warden, 829,817 |
|   | x | x | x |   | x | Basman, 1,126,348 |
|   | x | x | x | x | x | Middleton, 637,520 |
| x |   | x | x |   | x | Auld, 179,147 (Chimney) |
|   |   | x | x | x | x | Martin, 389,398 (Chimney) |
|   |   | x | x |   | x | Leitch, 891,485 |
|   | x | x | x | x | x | Dowman, 681,877 |
|   | x | x | x |   | x | Tanner, 758,720 |
|   | x | x | x | x | x | Herrmann, 339,099 (Chimney) |
|   | x | x | x | x | x | Lee, 910,398." |

-ing new. It is the mere tying together of so many sticks which retain their entirely separate identity of character and function. But the joining of old elements in a way to bring about a new and useful result is not aggregation—it is "combination" and patentable. Office Specialty Mfg. Co. v. Fenton Metallic Mfg. Co., 174 U.S. 492, 498, 19 S.Ct. 641, 43 L.Ed. 1058; Brinkerhoff v. Aloe, 146 U.S. 515, 516, 13 S.Ct. 221, 36 L.Ed. 1068; Pickering v. McCullough, 104 U.S. 310, 317, 318, 26 L.Ed. 749; Reckendorfer v. Faber, 92 U.S. 347, 357, 23 L.Ed. 719; Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L. Ed. 241. An expression of this rule as to combination of old elements, as applied to some sets of facts, is that the use of old elements which act co-operatively to produce a new and useful result is patentable. Brinkerhoff v. Aloe, 146 U.S. 515, 516, 13 S.Ct. 221, 36 L.Ed. 1068; Reckendorfer v. Faber, 92 U.S. 347, 357, 23 L.Ed. 719. There is no difference in the authorities as to the above rules defining aggregation and defining combination of old elements. The difficulty, sometimes, is in applying the rules to the fact situation.

The fact situation here is as follows. For many years there had been activity in this art.[5] As is to be expected, the earlier steps were concerned with the evacuation of smoke from chimneys—the need for building clearance of gases, fumes, etc., not yet having arisen or, at least, become important.[6] In fact, all four of the citations (Kennard No. 152,647, Auld No. 179,147, Day No. 297,972 and No. 15,921 (German) ) using an element to influence upwardly inclined air currents —the effect produced by the baffle ring (numeral 25) in this patent—are chimney ventilators, the latest being Day issued May 6, 1884. The appearance and enlargement of mills, foundries and other industries where gases, fumes, etc., were generated inside buildings created and continued to stimulate the search for efficient ventilation by evacuation of these annoying or harmful gases and fumes from the buildings.[7] Under this stimulus, various classes of roof ventilators came into being. These ventilators differed in principle and, therefore, in construction. From 1901 to 1920, ten purely building ventilator patents are shown by this record.[8] In spite of this activity in the Art, the

[5] The citations here go as far back as Kennard, No. 152,647, in 1874, for an "Improvement in Chimney-Top Ventilators."

[6] Appellant contends that chimney ventilators are not permissible citations because not within the art. There is some force in this suggestion but it cannot be adopted in full. They are proper citations but the effect thereof is weakened by the differences in the problems. In chimneys, the heated smoke and the relatively long chimney draft normally provide sufficient evacuating action and the problem, mainly, is to protect against strong winds which might lessen or prevent the normal action. In the ventilation of business establishments, these two factors of temperature and long draft are present, usually, in only a negligible degree. The problem there is to *increase* the normal evacuation in normal wind conditions and the need for protection against abnormal winds is vastly accentuated. Because of these differences in conditions and, therefore, in problems, chimney ventilators are not strong citations. On the other hand, they are outside ventilators intended to influence evacuation of smoke from inside a building, hence they cannot be placed entirely outside the art here involved.

An illustration of this situation is No. 15,921 (German patent). The "flaps" in

that patent operate only under relatively high wind pressures. Therefore, the patent gives no suggestion of value to one seeking to solve the problem of normal wind pressure.

[7] While this record shows numerous attempts to solve the chimney ventilation problem (Kennard No. 152,647, Auld No. 179,147, Day No. 297,972, Herrmann No. 339,099, Martin No. 389,398, Keane No. 483,384, No. 15,921 (Germany) and No. 4,418 (British 1894), the first citation here of an attempt to construct a ventilator entirely for other than chimney use is Middleton No. 637,520, issued November 21, 1899.

[8] These patents are Dowman No. 681,-877 (application and issuance in 1901), Tanner No. 758,720 (application 1903, issuance 1904), Jardine No. 796,914 (application and issuance 1905), Warden No. 829,817 (application 1905, issuance 1906), Leitch No. 891,485 (application and issuance 1908), Lee No. 910,398 (application 1908, issuance 1909), Warden No. 925,252 (application 1908, issuance 1909), Basman No. 1,126,348 (application 1914, issuance 1915), Maranville No. 1,247,698 (application 1916, issuance 1917), Shodron No. 1,270,879 (application 1913, issuance 1918), McAllister No. 1,285,275 (application 1917, issuance 1918). Also there was one patent designed for both chimney and building ventilation (Cleminson

results seem to have been so lacking in perfection that the United States Bureau of Standards undertook an extensive test of ventilators in the summer of 1920. Since this test covered some fifty ventilators and was made by men of presumed scientific training, extracts from a paper embodying their conception of the problems, their deductions and their conclusions are particularly valuable.[9] This paper appeared in January, 1921. After much experimentation, the application for this patent was filed on December 28, 1922.

Matters to be noted as to the state of the art are the following. The problem of chimney ventilators is different from that of ordinary building ventilators. The two are, however, not so unrelated that constructions in one might not be suggestive in the other. There was general recognition of the need to exclude weather from the eduction pipe and to utilize outside air to increase the natural draft of the pipe. Weather protection had been fairly well worked out by use of the cap, storm band and weather baffles. There was some confusion as to the principle of use of the outside air to increase pipe draft. In the purely building ventilators the decided trend was to utilize outside air by directing it into the ventilators and controlling its effect therein. Such were Dowman, Tanner, Jardine, Leitch, Basman,

---

(British) No. 10,047 of 1911), applied for in 1911 and accepted in 1912.

In addition to these patents the record shows certain constructions by Klauer in 1912 and by Burt in 1917 and models in the Bureau of Standards paper.

[9] Such extracts are as follows:

"During the summer of 1920 a study of some fifty 16-in. ventilators, shown in Fig. 1, was made at the Bureau of Standards, the ventilators having been submitted by the Construction Division, Q. M. Corps, of the Army. The following paper gives a brief summary of some of the results of the study.

The factors affecting the performance of a ventilator and the things which must be taken into consideration in the choice of a ventilator are so numerous that it was impossible to attempt a complete study. We limited ourselves definitely to certain specific phases of the problem and it must be kept in mind that the tests about to be described are particular tests with a certain experimental arrangement. The question as to how far the results of these tests apply to any other arrangement is left open.

Our experiments were confined to questions concerning the volume of air exhausted per minute by the ventilators, which is dependent upon many factors. For example, if the air does not have free access to the room, little air will be exhausted. If there are obstructions near the ventilator, the performance will be affected. The most important factors, however, affecting the performance of a ventilator are (1) the difference in temperature between the air in the room and the air outside and (2) the speed of the wind blowing across the top of the ventilator. Our experiments were restricted to these two factors.

The effect of a temperature difference is to produce the familiar chimney action, an action common to all ventilators, including an open pipe. The design of the ventilator affects the amount of air exhausted under a given temperature difference only insofar as more or less resistance is offered to the flow of air. If the ventilator passage is obstructed, less air will be exhausted. From this standpoint, a straight open vertical pipe is the ideal ventilator, but considerations of weather-proofness prohibit its use.

The exhaust due to the wind depends primarily upon the design of the ventilator. * * * The ventilators were placed in front of the mouth of the tunnel on the end of a vertical pipe, the wind stream being horizontal. * * *

Some ventilators exhaust less air than an open pipe, some more.

* * * * *

Ventilators may readily be divided into those of stationary and rotary forms, but any further sub-division for purposes of discussion is difficult. The simplest type of ventilator consists of a cap over the top of an open pipe with a band around pipe and cap to keep the rain from beating in. Such a ventilator exhausted 94 per cent as much air as an open pipe at the same wind velocity. In other words, it has a wind rating of 94. It permitted 86 per cent as much air to pass as an open pipe in the second experiment. * * *

These ventilators are typical of the stationary ones and the surprising fact is that the best exhaust is obtained with a very simple construction. * * *

In conclusion, two points should be emphasized. The first is that no general statement can be made as to the relative merits of rotary and stationary, or mushroom and siphon, ventilators. The performance depends on the particular models. It is possible to build a good stationary ventilator as well as a good rotary ventilator, and there are poor ventilators."

Shodron, McAllister, the Klauer construction, the Burt construction and some of the models shown in the Bureau of Standards paper. In most of the just mentioned ventilators, a "lip" was utilized for the purpose of concentrating and directing air into the ventilator, in some, there was free passage of air from below and in some a lip was used to partially trap air (Burt construction, some of Bureau of Standards models). Usually the lip is attached to the eduction pipe and usually at or near the pipe top—in some the lip is attached to an annulus located inside the storm band. Where a lip is used it is inclined downward and outward from the pipe. Another type, depends upon dampers or a movable sleeve to control or to exclude access of air to the eduction pipe top (Warden (both No. 829,817 and No. 925,252), Lee and the Burt construction). In none of them is there an upward inclined ring baffle. In only one is there anything approaching a suggestion of the desirability of excluding, to the practical maximum, the upward inclined air. That exception is in the paper of the Bureau of Standards. It goes no further than an inference which *might* arise from a study of some of the experiments conducted at the Bureau, as follows. All of the experiments were with a *horizontal* wind. The effect of an *upward inclined* wind had no part in the experiments or in the deductions therefrom. The revelation arose from the circumstances that, using a horizontal wind, it was discovered that some models having an eduction pipe lip were more effective and that, if the lip was lengthened, the effectiveness increased.

As to the chimney ventilators there were three (Kennard, Auld and Day) which had a ring baffle. In Kennard, the baffle is a downward slanting apron located some distance below the top of the pipe and removed from the ventilator proper. No function is assigned to this apron. It is no part of the novelty claimed. It is not conceived that it could have more than a negligible influence on the ventilation. Auld had the conception of using outside wind to create partial vacuums at the smoke outlets of his ventilator. He had in mind the action of horizontal, of downward and of upward winds. He used a cap (C) measurably extending outward above a "sleeve" (B)—which sleeve might be regarded as a storm band though it is given no such function

in the patent, in fact he makes no mention of weather—and an upward inclined pipe baffle (D) extending outward from the lower sleeve edge. In conception of principle, this patent is nearer than any other to the principle acted on by Young and Gephart here. When it comes to construction to carry out the conception of principle there is considerable difference. The Auld construction is unique. It contains three elements with proportions, relative positioning and shape (as to the sleeve) much unlike the later trend in building ventilators up to and including Young and Gephart. Also, his problem was really that of increasing the draft of a chimney which is, normally, affected only by winds above normal force. Day's conception was a construction which would accentuate the draft at the outlet (d) between the upward turned edge of the cap (D) and the outward flaring "shield" (C). This outlet is described as "the narrow throat d" and is shown in the drawings to be a relatively small opening. As to downward winds, he conceived that they would be caught by the cap upturned edge (b) and turned "upward and outward, thus creating by friction an upward current in the narrow throat d, which greatly assists in creating a draft in the flue." As to upward air currents he says "The same effect [creation of flue draft] is produced by the edge e [of the cap] and outwardly-flaring shield C, * * the band B serving to prevent the air from blowing directly up between the shield and flue." The band (B) is a horizontal band around the eduction pipe located "a short distance down from the pipe top." Considering that he intended d as the only outlet for the smoke; that d was a relatively small passageway; and that he contemplated increased draft at this top opening, it is not clear that he sought to exclude all upward air from the ventilator. His use of the qualification "directly" would seem to imply a desire to decrease the force and, possibly, the volume of upward air into the ventilator so as not to clog or interfere with the smoke passage through the narrow opening d. Another citation relied on by appellee in respect to exclusion of upward air currents is No. 15,921 (German). This is a chimney ventilator with a down-slant ring baffle located up in the storm band. This baffle may be solid or divided into multiple upwardly acting dampers. If the baffle is solid, it acts more as a lip partially excluding upward

air currents. If divided into dampers, such could be actuated only by an upward air current of considerable force.

Besides the ventilators discussed in the preceding two paragraphs, there are some other citations which are not helpful— such as Maranville which relates only to "roof connections for ventilators", Keane, No. 4,418 and No. 10,047 (both British), No. 534,378 (French), Martin, and Herrmann (where a downward and outward lip at the top of the flue is used to deflect air *into* the ventilator).

Into this somewhat chaotic art came those patentees. Up to that time fairly efficient ventilators for buildings under normal conditions of wind had been found but there was a realization that more should be done. The trend of thought in the art was to view the problem from the standpoint solely of horizontal winds. It is significant that all of the expert witnesses who had made practical experiments with ventilators had used only horizontal winds. The Bureau of Standards in its extended experiments, only about two and one-half years before this application was filed, had used solely horizontal wind (the conception of the Bureau being that the most important wind factor was "the speed of the wind blowing across the top of the ventilator"). This thought of horizontal wind had even gone into the conceptions of those who wished to accentuate entry of air into their ventilators from below—such was the purpose of the use of the downward and outward lip to deflect horizontal air upward into the ventilator. If the chimney ventilators of Kennard, Auld and Day contained suggestions, to those interested in development of building ventilators, of exclusion of upward air currents from business ventilators, such suggestions seem to have been entirely overlooked by the many who were studying the problem. The only steps in that direction are the use of the lip and the discovery by the Bureau investigators that, in some models, a lengthened lip increased ventilation efficiency.

When these patentees started their experiments to develop a good stationary type of ventilator they had no other conception than a horizontal wind. Their experiments were solely with a horizontal wind. Their conception of the problem seems to have been that it was one of size, shape and relative positioning of well known elements—cap, storm band, weather baffle and lip. They proceeded along this line of study and experimentation until they had developed a ventilator of good efficiency. With exception of the ring baffle, that ventilator was the one patented. They knew that most industrial buildings had sloping roofs, that horizontal winds striking a sloping roof would be deflected in an upwardly inclined direction; and that a good ventilator should operate well on sloping as well as flat roofs. Having this knowledge and having developed a stationary ventilator which operated well under purely horizontal air currents, they tilted the ventilator before the horizontal current and discovered the efficiency became zero and, in some positions, even less (as the wind went down the eduction pipe). From this they discovered the necessity for excluding upward air currents if the ventilator was to be useful on sloping roofs. After trying various methods of construction for excluding such currents, they finally settled on the ring baffle (25) as being effective in form, shape and positioning relative to elements of the ventilator as theretofore developed by them. This met the difficulty, and the ventilator was then as effective on a sloping roof as on a flat one.

One new result of this entire structure was development of a more highly efficient ventilator of the stationary class than then known. Another new result was that this efficient ventilator acted equally well on any kind of roof. Another new result was that the action of the ventilator could be predicted with fair accuracy under all conditions, normal and abnormal. Another new result was that such consequences were achieved in a ventilator of simple and economical construction with no moving parts.

Also, in this ventilator, every element had to cooperate with every other element to produce the ultimate result. It is true that the ventilator would work efficiently on a flat roof without aid from the ring baffle. However, the purpose and result was not to produce a ventilator which would be efficient only on flat roofs. It was to produce one which would work with equal efficiency on any kind of roof. The ventilator could not do that without the ring baffle.

Even though every element be regarded as old and as, separately, performing no new function, yet those elements were so brought together as to produce, in cooperation, new and useful results. A bringing together with such co-operative

action and such new and useful results is a patentable combination and not merely an aggregation. These claims 1 and 5 are valid.

### Infringement.

■ While valid, this patent came into a somewhat crowded art. That situation suggests restriction of scope. There is also the suggestion (Office Specialty Mfg. Co. v. Fenton Metallic Mfg. Co., 174 U. S. 492, 498, 19 S.Ct. 641, 43 L.Ed. 1058) that the tendency is to limit a combination entirely made up of old elements to the exact structure.

With these considerations of restriction on the patent in mind, we turn to a comparison of the distinguishing feature relied upon by appellee. This feature is the means of preventing entrance of upward inclined air into the ventilator. Appellant uses an upward slanting baffle attached to the eduction pipe and of such proportions and so positioned (relative to the storm band) as to deflect most of the ascending air upward and to the outside of the band. Appellee uses an inverted lip or trough attached to the lower and inner side of the storm band and coming well out toward the eduction pipe. Both are effective in keeping most of the upward air out of the ventilator.

Following are diagrammatical drawings of the two constructions, wherein, 1 is the eduction pipe, 2 is the lip (in claim 1), 3 is the cap, 4 is the storm band, 5 is the weather baffle and 6 is the ring baffle or the trough. The feature involved here is the ring baffle and trough 6.

Under the above restrictive considerations, it cannot be said that this patent is broad enough to cover all means of excluding upward air. At most, it can cover only such means as operate in the same manner as appellant's ring baffle, that is, means which direct upward currents outward of the storm band and upward. It operates by diverting upward air currents upwardly and outwardly so that they pass outside the storm band—while a little may enter the ventilator, that is a disadvantage and is held to the minimum consistent with weather-proofing. Appellee's baffle allows the ascending air to enter the storm band for a short distance where it is caught in the trough made by the baffle and the inside wall of the storm band. Although the action of appellant's baffle and of appellee's trough seem different, appellant contends that such is not the case but that the air is passed upward and outward of the storm band by the trough, the same as by its baffle. Appellant urges that this is so because the upward air, on striking the trough, builds up a "cushion" of air which acts as a buffer shunting the oncoming air upward and outward over the lower edge of the storm band. Appellee claims that the effect on the air by the trough is that it enters the storm band on the windward side where it is caught by the trough and that it follows around the trough to the lee side where it escapes outward but not upward. Each produces expert testimony as to its theory. None of such witnesses had ever demonstrated his belief by practical experiment. Fortunately, we do not have

PATENTED STRUCTURE        DEFENDANT'S STRUCTURE

to decide this matter by choosing between expert beliefs of witnesses, apparently equally well qualified and sincere. The record contains direct evidence of the results of experiments by uninterested and qualified experts. In the course of the investigation by the Bureau of Standards appears convincing testimony as to what happened when horizontal wind passes under the lower edge of a storm band and is caught by a lip. True, the wind there was not naturally an upward inclined wind but became such only as it passed the lower edge of the storm band—but it was an upward inclined wind when caught by the lip. Also, it is true that the lip there was attached to the eduction pipe while appellee attaches its trough to the inner lower edge of the storm band. However, it is difficult to believe that these two differences are sufficient to change *entirely* the action of the wind in the trough. The results of these experiments by the Bureau are stated as follows:

"A simple modification of No. 2 is shown in ventilator No. 3 (Fig. 3) where a lip is placed on the pipe. This ventilator is very sensitive as regards its orientation relative to the wind. On introducing a smoke stream it was found that the air passing upon the band separates into two parts, one part passing under the cap and diagonally out at the sides of the ventilator, the other passing underneath the lip and around the pipe. The quantity of air going by the two routes depends on the orientation of the ventilator relative to the air stream. The results varied by about 10 per cent in different experiments, according to the orientation.

"To investigate more fully the effect of the band, the band was lengthened as shown in modified No. 3 (Fig. 3) so as to extend a little below the lip. The wind rating increased from 96 to 130 and on an examination with a smoke stream it was found that no air entered the ventilator at all. The air blowing on the ventilator passed underneath the lip, the ventilator exhausting all the way around."

This statement convinces that appellee's theory of the action of the wind in the trough is correct. Since the broadest scope possible to give these claims—and we do not determine that they can be given such scope—is that they cover means operating in the same manner as the patented product and since the trough of ap-

pellee operates in a different manner from the ring baffle of appellant, we think there can be no infringement.

### Division of Costs.

Cross-appellant urges error in the action of the Court in dividing the costs. Of course, assessment of costs in equity cases is within the sound discretion of the Court. Clear abuse of that discretion must appear to require a different disposition by this Court. Applications of this rule in patent cases are instanced by Du Bois v. Kirk, 158 U.S. 58, 67, 15 S.Ct. 729, 39 L.Ed. 895, and Van Kannel Revolving Door Co. v. Uhrich, 8 Cir., 297 F. 363, 369, this Court, certiorari denied, 266 U.S. 604, 45 S.Ct. 91, 69 L.Ed. 463. We find no such error here.

### Conclusion.

The decree should be and is affirmed.