**U. S. PHILIPS CORPORATION,**
Plaintiff,

v.

**NATIONAL MICRONETICS INC., and**
**Ned W. Buoymaster, Defendants,**

v.

**NORTH AMERICAN PHILIPS COR-**
**PORATION, and N. V. Philips Gloeil-**
**ampenfabrieken, Counter-Defendants.**

No. 71 Civ. 921.

United States District Court,
S. D. New York.

Jan. 27, 1976.

Darby & Darby, P. C., New York City, for plaintiff; Morris Relson, Martin G. Raskin, New York City, of counsel.

Sandoe, Hopgood & Calimafde, New York City, for defendants; John Calimafde, Stephen Judlowe, New York City, of counsel.

Sullivan & Cromwell, New York City, for counter-defendant N. V. Philips; David Rigney, New York City, of counsel.

OPINION

WARD, District Judge.

This is an action alleging infringement of U. S. Patent No. 3,024,318 to Duinker et al. for a "Glass Gap Spacer for Magnetic Heads" (hereinafter the "Duinker patent") and U. S. Patent No. 3,246,383 to Peloschek et al. for a "Method of Manufacturing Magnetic Heads with Bonding Gap—Filling Materials" (hereinafter the "Peloschek patent"). For the reasons hereinafter stated, the Court holds the Duinker patent invalid and the Peloschek patent valid and infringed.

I. *The Parties, Jurisdiction and Venue*

Plaintiff U. S. Philips Corporation (hereinafter "Philips") is a Delaware corporation with its principal place of business in New York City whose primary business is licensing patents. It owns the rights to the two patents in suit through assignment from N. V. Philips Gloeilampenfabrieken (hereinafter "N. V. Philips"), whose employees developed the inventions which are the subject of the patents.

Defendant National Micronetics Inc. (hereinafter "Micronetics") is a New York corporation with its principal place of business at West Hurley, New York. It is in the business of manufacturing glass bonded ferrite cores for use in magnetic recording heads. Defendant Ned W. Buoymaster is one of the founders and President of Micronetics. He resides in Woodstock, New York.

This Court has jurisdiction of the parties and the subject matter of this action and venue is properly laid in this district.

II. *The Pleadings*

The complaint filed on March 2, 1971 originally charged defendants with infringement of three patents owned by plaintiff. Prior to trial, plaintiff withdrew the infringement claim relating to one of these patents. As to the infringement of the two remaining patents, plaintiff seeks a declaratory judgment, an injunction and damages. The defendants, by their answer, deny infringement and challenge the validity of both patents on the grounds of obviousness and indefiniteness. In addition, defendants have counterclaimed against plaintiff and additional defendants on the counterclaim, N. V. Philips and North American Philips Corporation, for patent misuse and violation of the antitrust laws. The counterclaims were severed and stayed pending the outcome of the patent infringement action which was tried to the Court.

### III. Background

Magnetic recording heads are devices used to record ("write") signals representing sound or information on a moving magnetic medium such as a tape, belt, or disc or to pick up ("read") such recorded signals. A magnetic recording head consists of a nearly closed ring of magnetic material with a minute non-magnetic gap around which ring a coil of wire is wrapped. The ring and gap structure comprise the core of the head which is the focus of this litigation. An electric current, when passed through the head, will create a small magnetized spot on the magnetic medium opposite the gap. This spot represents the recorded information. As the medium moves, successive, discrete spots will be magnetized. The smaller the spots and the closer they are spaced, the more information can be stored in the least amount of magnetic medium. This may be referred to as "high resolution" or "high bit density." The achievement of increasingly higher resolution or bit density depends to a great extent on various qualities of the recording head, including the size of the gap and the material of which the head is made. The shorter the gap, the smaller the magnetized spot. Ideally, the head material has low electrical conductivity to minimize the losses; that is, the least amount of electrical current introduced into the head will be lost to the generation of heat.

Magnetic recording is an old art but did not become commercially significant until World War II. Although the device has many applications, the principal use of concern in this litigation has been in computers.

### IV. The Duinker Patent

The Duinker patent, issued March 6, 1962 on an application filed September 11, 1956, concerns a magnetic recording head having a core formed of sintered ferro-magnetic oxide material, or ferrite,[1] with a glass filled gap. The patent addresses itself to the problem of chipping of the gap edges in heads composed of ferrite. It teaches that if the coefficients of expansion (hereinafter "CTE's")[2] of the glass and ferrite are matched to a degree closer than that necessary merely to assure a good bond, chipping of the ferrite edges in use will be eliminated.

The patent contains four claims each of which is asserted by plaintiff as infringed by defendants' products. These claims are set out in full in the margin.[3] The first and second claims differ only in that the former indicates the CTE's of the ferrite core and the glass gap-filler are substantially equal at the temperature of use whereas the latter indicates the CTE's are substantially equal in the entire temperature range from the temperature of use to the softening point of the glass. The third and fourth claims add to the first and second a glass fillet, a small additional portion of glass within the loop formed by the ferrite parts.

---

1. Ferrites are non-metal magnetic materials composed of zinc oxide, iron oxide, etc., mixed in powdered form and compressed and heated at high temperatures so that the separate particles fuse to form one solid body.

2. Sometimes referred to as the coefficient of thermal expansion, this term refers to the expansibility of a material upon change in temperature, measured as the change in length for a given temperature change divided by the total length.

3. The claims of the Duinker patent are:

 1. An annular magnetic recorder head for recording or reproducing magnetic recordings comprising at least two circuit parts of sintered ferromagnetic oxide material with an effective gap between said circuit parts, said gap being filled entirely with a glass material mechanically joining and bonding to each other said circuit parts, said glass material being the sole bonding agent between said circuit parts, said glass material having a coefficient of expansion substantially equal to the coefficient of expansion of said sintered ferromagnetic oxide material at the temperature at which the magnetic recorder head is used.

 2. An annular magnetic recorder head for recording or reproducing magnetic recordings comprising at least two circuit parts of sintered ferromagnetic oxide material with an effective gap between said circuit parts, said gap being filled entirely with a glass material mechanically joining and bonding to each other said circuit parts, said glass

Defendant Micronetics has admitted that its products contain every feature of the claims with the exception of the matched CTE's. Inasmuch as the equality of the CTE's is a limitation of each claim, defendants assert they do not infringe. Additionally, they assert that the patent is invalid because the term "substantially equal" is indefinite and because matching of CTE's is obvious in view of the prior art.

A. *Infringement*

 To determine whether an accused device infringes a patent, resort must be had to the claims. Infringement is made out when the accused product falls clearly within the claim. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

Each of the claims specifies that the CTE's of the glass and the ferrite should be substantially equal. Turning to the Micronetics products, the following table indicates the CTE's of the glasses and ferrites at the temperature of use and the percentages by which they differ in different cores:

| Part No. | Glass Type | Glass CTE | Ferrite Type | Ferrite CTE | % Diff. |
|---|---|---|---|---|---|
| 35058 | 2109 | $7.4 \times 10^{-6}$ | LM211 | $7.2 \times 10^{-6}$ | 2.7 |
| 30239 | 2107 | $7.5 \times 10^{-6}$ | M211 | $7.3 \times 10^{-6}$ | 2.7 |
| 30152 | 1303 | $7.7 \times 10^{-6}$ | M211 | $7.3 \times 10^{-6}$ | 5.5 |
| 30331 | 1303 | $7.7 \times 10^{-6}$ | LM211 | $7.2 \times 10^{-6}$ | 6.5 |
| 30134, 30245, 30156 | 1303 | $7.7 \times 10^{-6}$ | M210 | $7.1 \times 10^{-6}$ | 8.5 |
| 30005 | 1201 | $6.3 \times 10^{-6}$ | M210 | $7.1 \times 10^{-6}$ | 11.3 |
| 30037 | 2205 | $6.0 \times 10^{-6}$ | M210 | $7.1 \times 10^{-6}$ | 15.5 |
| 30085 | 2205 | $6.0 \times 10^{-6}$ | M211 | $7.3 \times 10^{-6}$ | 17.8 |
| 30064 | 2104 | $5.1 \times 10^{-6}$ | M211 | $7.3 \times 10^{-6}$ | 30.1 |

material being the sole bonding agent between said circuit parts, said glass material having a softening temperature, said glass material also having a coefficient of expansion substantially equal to the coefficient of expansion of said sintered ferromagnetic oxide material throughout the entire temperature range lying between the temperature at which the magnetic recorder head is used and the temperature at which the glass begins to soften.

3. An annular magnetic recorder head for recording or reproducing magnetic recordings comprising at least two circuit parts of sintered ferromagnetic oxide material having inner and outer surfaces with an effective gap between said circuit parts, said gap being filled entirely with a glass material mechanically joining and bonding to each other said circuit parts, said glass material being the sole bonding agent between said circuit parts, said glass material and said circuit parts forming a closed annular space, part of said glass material extending into said space in contact with the inner surfaces of said ferromagnetic oxide material, said glass material having a coefficient of expansion substantially equal to the coefficient of expansion of said ferromagnetic oxide material at the temperature at which the magnetic recorder head is used.

4. An annular magnetic recorder head for recording or reproducing magnetic recordings comprising at least two circuit parts of sintered ferromagnetic oxide material having inner and outer surfaces with an effective gap between said circuit parts, said gap being filled entirely with a glass material mechanically joining and bonding to each other said circuit parts, said glass material being the sole bonding agent between said circuit parts, said glass material having a softening temperature, said glass material and said circuit parts forming a closed annular space, part of said glass material extending into said space in contact with the inner surfaces of said ferromagnetic oxide material, said glass material having a coefficient of expansion substantially equal to the coefficient of expansion of said ferromagnetic oxide material throughout the entire temperature range lying between the temperature at which the magnetic recorder is used and the temperature at which the glass begins to soften.

As can be seen, the variation in the CTE's ranges from 2.7% to 30.1%. Plaintiff asserts that all of these products infringe claim one with respect to the CTE limitation.

To determine whether Micronetics products infringe the patent, we must construe the limitation in the claims that the CTE's of the glass and ferrite be "substantially equal."

■ In order to construe this term, resort must be had to the specifications for it is axiomatic that claims are to be construed in light of the specifications. *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 217, 61 S.Ct. 235, 85 L.Ed. 132 (1940). The specifications contain the following description of the invention:

"When the coefficients of expansion *are equal to one another* at the temperature at which the magnetic recorder head is used (*with a tolerance of 5%*), the tensions occurring in the glass are small thus preventing the production of strains in the ferrite which would also tend to facilitate chipping of the ferrite edges of the gap by the mechanical forces exerted by the operation of the magnetic recording carrier; . . . ."

The interpretation that must be placed on this language is that to practice the invention one must make the CTE's as equal as possible with a maximum allowable difference of 5%. The examples of suitable matches given by the inventor are all well within this 5% limit. Thus, the term substantially equal, as used in the claims, should be given the meaning "matched within 5%."

Turning to the accused devices, only two Micronetics heads fall clearly within the range claimed by the patent, parts numbered 35058 and 30239 and could be said to infringe.

■ Plaintiff argues that all the cores manufactured by Micronetics infringe under the doctrine of equivalents. Courts have recognized that infringe-ment may be made out even though the accused device does not duplicate every literal detail of the patented invention. The test of infringement under the doctrine of equivalents is whether the device " 'performs substantially the same function in substantially the same way to obtain the same result.' " *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra*, 339 U.S. at 608, 70 S.Ct. at 856. The range of equivalents to be accorded a patent varies with the circumstances of the particular case. A primary, or pioneer, invention may be accorded a broad range of equivalents whereas an improvement patent is not entitled to such a broad range of protection. 4 A. Deller, *Deller's Walker on Patents*, § 232, at 82–83 (2d ed. 1965). Basically, the inquiry is whether the inventive principle has been appropriated and the changes made insubstantial.

■ The sole claimed invention in Duinker is the discovery that ferrite gap edge-chipping may be avoided by matching the CTE's of the glass and ferrite within a tolerance of 5% at the temperature of use and 10% over the range from room temperature to the softening point of the glass. The prior art concerning magnetic recording heads is crowded and the claimed invention is narrow. To construe the range of equivalents to be accorded the Duinker patent to embrace all of the Micronetics cores would render the term "substantially equal" meaningless and would have the effect of reading it out of the patent altogether. This term is an express limitation pertaining to the inventive step and implies, in effect, that anything beyond the limitation will not produce equivalent results. Inasmuch as the inventor has declared combinations, such as those found in the accused devices, not equivalent, we cannot treat them otherwise to find infringement. *See Dow Chemical Co. v. Skinner*, 197 F.2d 807, 810 (6th Cir.), *cert. denied*, 344 U.S. 856, 73 S.Ct. 94, 97 L.Ed. 664 (1952); *Preformed Line Products Co. v. Fanner Manufacturing Co.*, 225 F.Supp. 762, 774 (N.D.Ohio 1962), *aff'd*, 328 F.2d 265 (6th Cir.), *cert.*

*denied*, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964).

Nor can a change in the match of the CTE's be considered an insubstantial alteration in the practice of the invention. The whole inventive principle in the patent lies in the match of the CTE's. When the CTE's are not matched in the manner specified the inventive principle is not appropriated. Thus, although the accused devices accomplish the same result; that is, they are commercially acceptable cores free from undue chipping, they do so in a different manner. First, as plaintiff's expert testified, improvements in ferrites have to some extent reduced the chipping problem to which Duinker is directed. Second, Micronetics devices follow a different teaching. Micronetics cores are produced according to the principle that glass is strongest under compression and, thus, ferrite of a higher CTE than the glass is used. This is nowhere taught by Duinker.

■ Therefore, it cannot be said that all the Micronetics cores infringe plaintiff's patent under the doctrine of equivalents. The Court has examined plaintiff's other arguments in support of a finding of infringement and finds them to be without merit. Accordingly, the Court finds that only Micronetics parts numbered 35058 and 30239 infringe the Duinker patent.

### B. *Indefiniteness*

Defendants argue that the Duinker patent is invalid because it lacks the definiteness of description required by 35 U.S.C. § 112. They contend that the term "substantially equal," as used to describe the degree of CTE match, is vague and indefinite. Further, they contend that there is no such thing as a CTE at the temperature of use and that this meaningless relationship compounds the indefiniteness of the claims and specifications.

■ Although the statute requires an exact description of the invention, it does not require description in terms of exact measurement. All that is required is that the claims, when read in light of the specifications, inform those skilled in the art how to practice the invention and how infringement may be avoided. *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 65, 43 S.Ct. 322, 67 L.Ed. 523 (1923); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958). Whether a given claim has the requisite definiteness depends upon the facts in each case. *Georgia-Pacific Corp. v. United States Plywood Corp., supra.*

■ Applying these standards to the facts of the instant case, the Court finds that the specifications and claims are sufficiently definite to meet the statutory standard of 35 U.S.C. § 112. There are many instances where claims with adverbs such as "substantially" have been upheld against a challenge of indefiniteness. *See, e. g., Eibel Process Co. v. Minnesota & Ontario Paper Co., supra; Borg-Warner Corp. v. Paragon Gear Works, Inc.*, 355 F.2d 400 (1st Cir. 1965), *petition for cert. dismissed*, 384 U.S. 935, 86 S.Ct. 1461, 16 L.Ed.2d 536 (1966); *Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc.*, 350 F.2d 885 (5th Cir. 1965); *H. H. Robertson Co. v. Klauer Mfg. Co.*, 98 F.2d 150 (8th Cir. 1938). Thus, such terminology is certainly not indefinite as a matter of law.

Defendants rely on expert testimony, arguing that neither side's expert could precisely define what was meant by "substantially equal" as used in the claims. However, the Court does not view the testimony of either expert as persuasive on this particular point. Rather, the patent speaks for itself.

The Court finds that the term "substantially equal" as used in each claim of the patent is not so indefinite as to render the patent invalid.

Nor does the discussion of matching CTE's at the temperature of use, when added to the imprecision of the term "substantially equal" render the patent invalid under § 112. The premise underlying Duinker's invention is that edge-chipping results from the heat generated

by the movement of the recording head over the magnetic medium. Defendants' expert testified that the CTE at any given temperature was meaningless, that one needed a range between one temperature and another. Although the patent speaks of the "temperature of use," or room temperature, it is clear from the patent as a whole, particularly the examples given, that this refers to the range of temperature between 0°C and 40°C. Thus, the claims dealing with the CTE's of the glass and ferrite at the temperature of use are not meaningless.

## C. *Obviousness*

The principal question raised with respect to the validity of the Duinker patent is whether the invention would have been obvious at the time it was made to a person having ordinary skill in the art. 35 U.S.C. § 103. Resolution of the question requires application of the procedure set out in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). That is:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Id.* at 17–18, 86 S.Ct. at 694.

The parties agree that this is the standard to be applied. They disagree, however, on what constitutes the pertinent prior art and on the conclusion this Court should reach in applying the agreed standard to the prior art.

### 1. *Scope and Content of the Prior Art*

Defendants cite as pertinent prior art U.S. Patent Nos. 2,071,196 to Burger et al.; 2,167,482 to Hull et al.; 2,371,627 to Kingston; an article by Chynoweth, dated August, 1955 and a German publication entitled "The Methods of Fusing Ceramics to Glass and Metal," dated 1942. They argue that these authorities fully disclose that which Duinker claimed as his invention. Plaintiff, on the other hand, contends that each of these authorities is merely concerned with achieving good bonding and that none discloses information which would make it obvious to one skilled in the art to match CTE's of the glass and ferrite to an extent closer than that needed to achieve good bonding in order to alleviate ferrite gap edge chipping. A closer examination of each of the cited items is necessary.

### *The Burger Patent*

This patent, issued in 1937, concerns glass-to-metal-seals in general. It is directed at resolving the problem posed by failure of the seal in use, although a good seal may have been initially created. According to the patent, differences in the CTE's of the glass and metal introduce strains in the seal which result in fissures or cracks in the glass. In the language of the patent,

> In the prior seals, the glass and metal members, even though they may have had substantially the same coefficients of expansion at room temperature, have had different thermal expansions at the different temperatures involved in the process of making the seals and these members have undergone individual expansions and contractions in size during the heating and cooling cycles. Consequently, such seals have involved strains introduced at the higher temperatures which were carried through to the lower temperatures. Even though these residual strains may not have been greater than the elastic limit or breaking strength of

the glass, depending upon the amount and kind of metal employed, at the time the seal was made, there has always been the possibility that the seal might eventually fail due to aging of the glass and the reduction of its elastic limit over a period of time, and many failures may be attributed to this cause. In view of these considerations, it is evident that none of the seals of the prior art has been entirely free from strain over the whole temperature range between room temperature and the softening temperature of the glass.

\* \* \* \* \* \*

Even though this strain is not sufficient to produce cracks or fissures at the time the seal is made, the glass is weakened at the joint and the seal is much more liable to failure, when the tube is operated at elevated temperatures, or even when it is idle and at room temperature. It is apparent that when an electric discharge tube of which the seal constitutes a part of the envelope is heated during operation, the temperature reached may be one of those temperatures at which there is a substantial difference in the respective thermal expansion coefficients of the glass and metal. This difference of expansion may serve to accentuate the residual strain or perhaps introduce additional strains.

As a solution to the problem of strain in glass-to-metal seals, the patent discloses that the CTE's of the glass and metal should "substantially coincide" at room temperature and through the temperature range to the softening point of the glass. The patent discloses a metal alloy and a glass having this characteristic. The graph which illustrates the invention shows the CTE's of these materials as matched to a degree of equality even closer than that disclosed by Duinker.

### The Hull Patent

This patent, issued in 1939, on an application filed in 1936, is for an improvement in the glass-to-metal seal disclosed by Burger. It discloses new metal alloys and glasses which when combined in a seal will have "substantially corresponding" CTE's. The CTE graphs which illustrate the invention show a CTE match approaching identity and closer than that disclosed by Duinker.

### The Kingston Patent

Issued in 1945, on an application filed in 1939, this patent relates to metal alloys and glasses for use in forming vacuum tight seals over long periods and over a wide temperature range. It likewise discloses the importance of matching the CTE's of the glass and metal up to the softening point of the glass.

### The Chynoweth Article

Entitled "Ferrite Heads for Recording in the Megacycle Range," this article appeared in the August, 1955 issue of *Tele-Tech & Electronic Industries*. The article reports on research conducted with ferrite recording heads. Specifically, it concerns the wearing quality of ferrite heads with short gap lengths used in contact with a magnetic medium. According to the article, the gap edges chipped in use and this poor wearing quality represented a serious deficiency in ferrite heads. The article then discloses that:

A technique which holds some promise, [for decreasing this gap edge erosion] is to fill in the gap with a glaze material which is non-magnetic, bonds well to the gap faces and is hard.

According to the article such a head was constructed and the glazing technique was successful in increasing the head's resistance to wear.

### The German Article

This article, concerning the methods of fusing ceramics to glass and metal, appeared in the German publication *Keramische Rundschau* in 1942. The article discloses that when bonding glass and ceramic, "no stresses will exist between the two materials only if the expansion curves have exactly the same course." Since this ideal is not practically attain-

able, the author suggests using a ceramic with a higher CTE than the glass.

### 2. Differences Between the Prior Art and the Claimed Invention

From the above recitation, it is apparent that all the individual elements claimed in the Duinker patent are shown by the prior art. However, no single item of the prior art shows the whole Duinker invention.

Defendants contend that the German article when read with the Chynoweth article fully discloses the Duinker invention. Plaintiff argues, on the other hand, that the German article was published before the development of ferrites and, thus, does not apply to ferrites. Further, plaintiff argues that Chynoweth does not disclose a gap completely filled with glass but merely glazed gap surfaces. Above all, plaintiff argues that none of the prior art references discloses that ferrite head edge-chipping is caused by unequal CTE's and that the solution lies in matching the CTE's to a degree closer than that necessary to attain a good bond.

Comparing the prior art with the claimed invention, as the Court must, the Court finds the following differences between the Duinker patent and the prior art: The patents to Burger, Hull, and Kingston disclose the importance of matching CTE's very closely to obtain strain-free glass-to-metal bonds. However, none of these patents deal with ferrites. Although they disclose that failure of the bond will result from use, if CTE's are not matched to substantial equality, in practical application the failure results in cracking of the glass in glass-to-metal bonds. Thus, they do not read exactly on the problem faced by Duinker.

The German article is concerned with bonding glass to ceramics, generally. It discloses that ideally CTE's should be equally matched to achieve a good bond. It is true that the article was written prior to the development of ferrites; however, it is undisputed that ferrite is a ceramic. Given this agreed fact and the article's concern with ceramics in general, the German article reads directly on the Duinker invention insofar as it indicates the desirability of matching CTE's in glass-to-ceramic bonds. It does not, however, disclose the more particular application of this principle claimed by Duinker.

The Chynoweth article does disclose glazing in the gap as a solution for improving the wearing problems in ferrite core gap edges. It is silent, however, on the CTE's of the materials used.

Plaintiff seeks to make much of these differences. As noted above, no one item of prior art fully discloses the Duinker invention. However, the proper standard to be applied is not whether the prior art fully discloses the precise invention claimed, but rather whether, in light of this prior art, the claimed Duinker invention would be obvious to one skilled in the art. See, e. g., Koppers Co. v. S & S Corrugated Paper Machinery Co., 517 F.2d 1182 (2d Cir. 1975); Julie Research Laboratories, Inc. v. Guildline Instruments, Inc., 501 F.2d 1131 (2d Cir. 1974); Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536 (2d Cir. 1966).

Applying this standard to the facts of this case, the Court holds that the Duinker patent is invalid for obviousness in light of the prior art. First, Burger fully discloses that in glass-to-metal bonds failure occurs in use, even though a good bond is achieved in manufacture, if the CTE's of the glass and metal are not nearly equal, not only at room temperature but throughout the entire temperature range from room temperature through the softening point of the glass. Burger fully discloses that the heat generated in use elevates the temperature sufficiently to result in failure of the bond unless the CTE's are so matched. The prior art in making glass-to-metal bonds demonstrates that it was well known that CTE's should be closely matched to achieve good wearing qualities in use.

Plaintiff argues that the problems posed by glass-to-metal bonds are not

analogous to those encountered by Duinker and these items should not be considered prior art. Plaintiff stresses that in glass-to-metal bonding the concern is with the glass whereas the glass is not a problem in bonding glass to ferrite.

Prior to the introduction of ferrites, magnetic recording heads were constructed of metal, often metal laminations. In the Duinker patent file wrapper, the Court finds at least one instance where glass was bonded to the metal pole pieces of such a metal head in order to join the two pole pieces. Thus, it appears that bonding glass to the metal heads was known in the magnetic recording head field.

Also, in light of the German article it would have been obvious that there were no significant differences with regard to the role of CTE's between ceramic-to-glass bonds and metal-to-glass bonds.

The patent examiner considered glass-to-metal bonds to be prior art in considering the patentability of the Duinker invention. The Court is constrained to likewise consider it. The only testimony presented at trial on the question is found in the conflicting opinions of the experts who testified on behalf of the respective parties. The Court is unpersuaded that the problem of ferrite gap edge chipping is completely different from the problem of glass breakage. Both are caused by strains in the bond. In glass-to-metal bonds the metal is not likely to crack or chip, therefore, it is the glass which suffers the effect of the strains. The inherent granularity of ferrite was well known and it seems obvious that the strains known to be in the bond would cause the ferrite to chip.

Thus, when one considers the disclosures of Burger together with the teaching of the German article, it would be obvious that making the CTE's substantially equal would alleviate chipping of the ferrite. When these references are read together with the Chynoweth article, the invention claimed by Duinker becomes an obvious solution to the problem of making ferrite cores for recording heads with good wearing qualities.

Plaintiff relies on the presumption of validity accorded a patent. In the Second Circuit the presumption of validity is weakened when the patent examiner did not consider all of the pertinent prior art. *See, e. g., Julie Research Laboratories, Inc. v. Guildline Instruments, Inc., supra; Formal Fashions, Inc. v. Braiman Bows, Inc., supra.* In the instant case, the patent examiner did not consider the Burger patent or, most important, the German article. Thus, the presumption of validity to be accorded the Duinker patent is considerably weakened.

In addition, plaintiff relies on the secondary considerations enunciated in *Graham v. John Deere Co., supra* as indicia of the non-obviousness of the Duinker invention. Because of the danger of slipping into hindsight and reading into the prior art the teachings of the Duinker invention, the Court has considered the evidence of commercial success and long-felt but unsolved need. This inquiry has served only to reinforce the Court's judgment that the Duinker patent is obvious in view of the prior art.

First, plaintiff introduced no evidence of contemporaneous commercial success. The only evidence introduced relevant to this issue concerns the use at the time of the action of the Duinker invention by Ferroxcube Corporation, a wholly-owned subsidiary of North American Philips Corporation which manufactures glass bonded ferrite recording heads, and Micronetics. However, none of the cores produced by Ferroxcube utilize the Duinker invention, according to the Court's construction of the patent, and the majority of Micronetics' products, also, fall outside the invention.

Likewise, there is no evidence of any long-felt want. Ferrites were first introduced around 1950 and Duinker first filed for his patent in 1955. The evidence indicates that this was a crowded art with considerable activity during this period. The witnesses who testified

painted a picture of a milieu where as soon as one group of researchers discovered a problem others set about solving it. *Cf., Julie Research Laboratories, Inc. v. Guildline Instruments, Inc., supra; Indiana General Corp. v. Krystinel Corp.,* 421 F.2d 1023, 1030–31 (2d Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

In sum, the Court holds that the Duinker patent is invalid for obviousness in light of the prior art. There may be some novelty in the Duinker invention but novelty is insufficient to meet the non-obvious requirement of § 103 when the novel element would have been obvious to a person skilled in the art. *See Lemelson v. Topper Corp.,* 450 F.2d 845 (2d Cir. 1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1253, 31 L.Ed.2d 456 (1972).

Next, the Court turns to the Peloschek patent.

## V. *The Peloschek Patent*

The Peloschek patent, issued April 19, 1966 on an application filed May 3, 1963,

is directed to a process for manufacturing bonded magnetic recording heads of a kind described by Duinker. The patent addresses itself to the problems of manufacturing magnetic recording heads with very short gap lengths, simply, and achieving close gap length tolerances.[4] The patent teaches that if the gap is pre-set by placing the two magnetic pole pieces in a confronting relationship with the interposition of a shim, or spacing member, equal to the desired gap length and the glass is placed adjacent to the pre-set gap and the assembly is heated, the glass will flow into the gap by capillary action and fill it, thus, producing a core with the desired gap length.

The patent contains fifteen claims. With the exception of claims 7, 12 and 13, all are assertedly infringed by defendants. The claims in issue are set out in full in the margin.[5] The several claims differ from each other only in minor respects. Claim 10 is the broadest claim and comprises a method whereby

---

**4.** "Close tolerance" refers to the small degree of deviation from the desired gap length or the slight "margin of error." Inasmuch as the patent speaks of gap lengths of 1 to 20 microns, the acceptable deviation, or tolerance, is very slight.

**5.** 1. A method of manufacturing portions of magnetic heads composed of two magnetic circuit parts consisting of sintered oxidic ferromagnetic material and having confronting gap surfaces with a gap therebetween filled with a nonmagnetic material bonding the circuit parts together, comprising: placing spacing members having a thickness equal to the desired gap length at opposite ends of a first polished gap surface of one circuit part, placing a corresponding polished gap surface of a second circuit part on said spacing members in confronting relationship with said first surface thereby forming a gap between said surfaces, placing a quantity of nonmagnetic material adjacent to the gap, said nonmagnetic material having a melting temperature below that of said ferromagnetic material, and heating the resulting assembly to the melting temperature of said nonmagnetic material, whereby said nonmagnetic material melts, fills the gap by capillary action, and bonds the circuit parts together.

2. A method according to claim 1, wherein said nonmagnetic material is glass.

3. A method according to claim 1, wherein said nonmagnetic material is enamel.

4. A method according to claim 1, wherein pressure is applied to the assembly during the heating step.

5. A method of manufacturing portions of magnetic heads composed of two circuit parts consisting of sintered oxidic ferromagnetic material and having gap surfaces with a gap therebetween filled with a nonmagnetic material bonding the circuit parts together, comprising: heating the two circuit parts, cooling the two circuit parts, placing spacing members having a thickness equal to the desired gap length at opposite ends of the first polished gap surface of one circuit part, placing a corresponding polished gap surface of a second circuit part on said spacing members in confronting relationship with said first surface thereby forming a gap between said surfaces, placing a quantity of nonmagnetic material adjacent to the gap, said nonmagnetic material having a melting temperature below that of said ferromagnetic material, and heating the resulting assembly to the melting temperature of said nonmagnetic material, whereby said nonmagnetic material melts, fills the gap by capillary action, and bonds the circuit parts together.

6. A method of manufacturing portions of magnetic heads composed of two circuit parts consisting of sintered oxidic ferromagnetic material and having gap surfaces with a gap ther-

the two confronting circuit parts or pole pieces are separated by a space equal to the desired gap length, the non-magnetic material is placed adjacent to the gap, and the assembly is heated to the melting temperature of the glass so that the gap is filled by capillary action. Claim 1 differs from claim 10 only in that it recites that the unfilled gap is pre-fixed by the placing of a spacing member or shim between the confronting pole pieces. Claim 5 adds to claim 1 the step of thermally etching the circuit parts before they are placed in a confronting relation-

ship. Claim 6 is like claim 1 with the addition that the finished assembly is cut perpendicularly to form a plurality of cores. The remaining claims variously recite that the non-magnetic material is either glass or enamel or that pressure is applied during heating.

Defendant Micronetics admits that its products contain every feature of the claims with the exception of the gap space or spacer being equal to the desired gap length and the thermal etching step. Inasmuch as the equality of the

ebetween filled with a nonmagnetic material bonding the circuit parts together, comprising: placing spacing members having a thickness equal to the desired gap length at opposite ends of at least two polished gap surfaces of one circuit part, placing the corresponding polished gap surfaces of a second circuit part on said spacing members in confronting relationship with the gap surfaces of said one circuit part thereby forming gaps between said surfaces, placing a quantity of nonmagnetic material adjacent to the gaps, said nonmagnetic material having a melting temperature below that of said ferromagnetic material, and heating the resulting assembly to the melting temperature of said nonmagnetic material, whereby said nonmagnetic material melts, fills the gaps by capillary action, and bonds the circuit parts together, cooling the assembly, and then cutting the assembly along mutually perpendicular axes to form a plurality of head portions.

\* \* \* \* \* \*

8. A method according to claim 6, wherein said nonmagnetic material is glass.

9. A method according to claim 6, wherein said nonmagnetic material is enamel.

10. A method of manufacturing portions of magnetic heads composed of two circuit parts consisting of sintered oxidic ferromagnetic material and having confronting gap surfaces with a gap therebetween filled with a nonmagnetic material bonding the circuit parts together, comprising: placing a polished gap surface of one circuit part in confronting relationship with a corresponding polished gap surface of a second circuit part, said surfaces being separated by a gap equal to the desired gap length, placing a quantity of nonmagnetic material adjacent to the gap, said nonmagnetic material having a melting temperature below that of said ferromagnetic material, and heating the resulting assembly to the melting temperature of said nonmagnetic material, whereby said nonmagnetic material melts, fills the gap by capillary action, and bonds the circuit parts together.

11. A method according to claim 10, wherein said nonmagnetic material is glass.

\* \* \* \* \* \*

14. A method of manufacturing portions of magnetic heads composed of two circuit parts consisting of sintered oxidic ferromagnetic material and having confronting gap surfaces with a gap therebetween filled with a nonmagnetic material bonding the circuit parts together, comprising: heating the circuit parts, cooling the circuit parts, placing a polished gap surface of one circuit part in confronting relationship with a corresponding polished gap surface of another circuit part, said surfaces being separated by a gap equal to the desired gap length, placing a quantity of nonmagnetic material adjacent to the gap, said nonmagnetic material having a melting temperature below that of said ferromagnetic material, and heating the resulting assembly to the melting temperature of said nonmagnetic material, whereby said nonmagnetic material melts, fills the gap by capillary action, and bonds the circuit parts together.

15. A method of manufacturing portions of magnetic heads composed of two circuit parts consisting of sintered oxidic ferromagnetic material and having confronting gap surfaces with a gap therebetween filled with a nonmagnetic material bonding the circuit parts together, comprising: thermally etching the gap surfaces of the two circuit parts, placing a polished gap surface of one circuit part in confronting relationship with a corresponding polished gap surface of another circuit part, said surfaces being separated by a gap equal to the desired gap length, placing a quantity of nonmagnetic material adjacent to the gap, said nonmagnetic material having a melting temperature below that of said ferromagnetic material, and heating the resulting assembly to the melting temperature of said nonmagnetic material, whereby said nonmagnetic material melts, fills the gap by capillary action, and bonds the circuit parts together.

shim and the desired gap length is a limitation of each claim, defendants assert they do not infringe. Additionally, they assert that the patent is invalid because the term "equal to" is indefinite and because the claimed invention is obvious in view of the prior art.

### A. Indefiniteness

As with the Duinker patent, defendants argue that the Peloschek patent is invalid because it lacks the definiteness of description required by 35 U.S.C. § 112. They contend that the term "equal to" as used to describe the relationship between the spacer and the desired gap length is without ascertainable meaning.

 The Court finds that the specifications and claims are sufficiently definite to meet the statutory standard. As already noted, the gap dimensions are exceedingly small and absolute precision in measurement cannot always be achieved. Just as a certain tolerance is acceptable in terms of the final core, an equivalent tolerance should be permitted with regard to the shim. The claims, when read with the specifications more than adequately inform those skilled in the art how to practice the invention and how to avoid infringement.

### B. Obviousness

As with the Duinker patent, the principal challenge raised by defendants to the validity of the Peloschek patent is that the invention would have been obvious at the time it was made to a person having ordinary skill in the art. Thus, it is necessary to examine the scope and content of the prior art and the differences between the prior art and the Peloschek claims.

### 1. Scope and Content of the Prior Art

Defendants cite as pertinent prior art U. S. Patent Nos. 2,500,748 to Grant; 3,024,318 to Duinker et al.; 3,029,505 to Reichenbaum; 3,094,772 to Duinker; 3,117,367 to Duinker et al.; 3,283,396 to Pfost; 3,304,358 to De Jean et al.; 3,341,939 to Feinberg et al.; 3,065,571 to Hill; German patent 10546; and two German articles. Defendants contend that in light of this prior art the use of capillary action to manufacture glass bonded ferrite cores would have been obvious and represented merely routine engineering. Plaintiff, on the other hand, contends that all the cited prior art which is relevant to the problem points toward the non-obviousness of the patented invention and that none shows the capillary process in the recording head industry.

### The Three Duinker Patents

Duinker '318 is the patent here in suit and discussed above. The method of manufacturing the invention disclosed by the patent consists of placing a glass foil which exceeds in size the ultimately desired gap width by a few percent between two confronting polished ferrite gap surfaces. This assembly is then heated to a temperature within the softening range of the glass and pressure is applied until the correct gap-width is reached. This can be referred to as the "sandwich" technique. Relevant, also, is a method of manufacturing the glass fillet consisting of placing a glass rod inside the ferrite loop near the gap so that during heating the glass spreads to form the fillet.

Duinker '722, issued June 25, 1963 on an application filed June 26, 1957, discloses merely a further refinement and expanded discussion of the manufacturing technique disclosed in the first Duinker patent. Additionally, it includes the disclosure of slicing the ferrite glass assembly to form a multiplicity of cores.

Duinker '367, issued January 14, 1964 on an application filed June 15, 1959, discloses a further refinement of the sandwich technique by the addition of shims or spacers, "the thickness of these spacers being substantially equal to the finally desired gap length." The description explains that the spacers were intended to alleviate the problem of glass flowing away in heads with a gap length of greater than 10 microns. The func-

tion of the spacers is to fix the gap length. They are placed at the ends of the sheet of glass and between the ferrite bars prior to the heating and compression steps and are then ground away after cooking.

### The Pfost Patent

This patent, issued November 8, 1966 on an application filed April 17, 1961, exemplifies another variation of the sandwich technique. The method disclosed consists of depositing spacer strips on one ferrite surface and a thin layer of glass on the other ferrite surface, placing the two ferrite surfaces in a confronting relationship, and heating the assembly to a temperature of 550–900 degrees centigrade under high pressure. The patent, also, discloses heating the ferrite blocks to a temperature of 600 degrees centigrade prior to coating with either glass or spacer in order to remove contaminants. Of significance to this litigation is the disclosure in the specifications that at temperatures between 550–900 degrees centigrade, glass will wet the ferrite.

### The Hill Patent

This patent, issued on November 27, 1962 on an application filed October 10, 1957, concerns a composite material of platinum alloy and glass for use in making glass-to-metal seals. The parties are in dispute as to what this patent discloses. Defendants contend that the patent discloses that capillary action is a customary method for bonding glass and metal. Plaintiff argues capillarity is discussed in general terms. The Court finds that capillary action is discussed in general terms as the physical principle which is the foundation for the invention. The patent discloses that glass is a liquid and will behave as a liquid insofar as capillary action is concerned. Thus, in order to achieve a good glass-to-metal bond, the patent claims an alloy which exhibits superior wetting action.

### Prior Art Processes Utilizing the Principle of Capillary Action

A group of defendants' prior art references may be conveniently categorized as illustrations of the use of capillary action in connection with manufacturing processes with materials other than glass and ferrite.

The patent to Reichenbaum, issued April 17, 1962 on an application filed September 29, 1958, falls into this category. It discloses the process of bonding a semiconductor to a metal base, a heat sink, by means of flowing solder between the two parts by capillary action. A small quantity of solder is placed adjacent to the empty space between the two materials and on melting flows into the space.

The patents to De Jean, Feinberg, and the German patent all disclose the process of manufacturing a laminated magnetic core by flowing non-magnetic resins into the minute space between the laminations by capillary action. The German patent, in particular, is for manufacturing metal laminated recording head cores.

The Grant patent, issued March 14, 1950 on an application filed November 21, 1947, concerns a method for manufacturing magnetic structures consisting of two or more magnetizable members separated by a non-magnetic gap. According to the claims, the invention comprises:

2. In a magnetic structure, a first magnetizable member provided with a mortise, a second magnetizable member having a projection thereon forming a tenon, said two magnetizable members being interfitted to form a mortise and tenon joint, a washer of low melting point non-magnetizable material brazed between said members adjacent said joint, and a capillary film of said non-magnetizable material brazed between contiguous surfaces of said mortise and tenon, thereby rigidly to connect said magnetizable members together and to form therebetween a permanent non-magnetic gap of fixed dimensions.

In plain English, the patent discloses a structure consisting of two magnetic parts separated by a minute permanent non-magnetic gap, which also bonds the

two together, created by flowing non-magnetic material between the two parts by capillary action.

### 2. Differences Between the Prior Art and the Claimed Invention

From the preceding recitation, it is apparent that no one item of prior art discloses the whole of the Peloschek process. Defendants contend, however, that the use of capillary action to fill spaces was well known and that it was an obvious solution to the problem of filling the non-magnetic gap in ferrite recording head cores. They contend that when the prior art disclosures concerning capillary action are read together with the disclosures of the Duinker patents, Peloschek results.

The most apparent difference from the Duinker patents process is that Duinker uses pressure to fill the gap rather than capillary action. Consequently, Duinker places the glass inside the gap rather than adjacent to it. However, Duinker does disclose the use of shims to determine the final gap length. Plaintiff makes much of the difference it perceives between the use of the shims in connection with setting the gap prior to the introduction of the glass in Peloschek and the use of the shims to keep the ferrite slabs apart during compression in Duinker. The Court finds this to be a difference without substance. In both patents the shims are equal or substantially equal to the ultimately desired gap length, they are placed between the two ferrite pieces to keep them a fixed distance apart.

Duinker, also, discloses that glass will wet ferrite. If one looks at the diagram in Duinker '772, one can clearly see the miniscus formed by the glass fillet. Wetting action of this sort is necessary for capillary action and the degree of surface tension as indicated by the miniscus and the wetting angle formed by the miniscus are crucial variables in determining the extent of capillary flow.[6]

The Pfost patent, so far as is relevant here, does not materially differ from the Duinker process. It, also, uses pressure to fill the gap with glass and spacers to determine the gap length. It does not speak to the use of capillary action to fill the gap, except that it notes that glass will wet ferrite at temperatures ranging from 550–900 degrees centigrade. It discloses a preliminary step of heating the ferrite to a temperature of 600 degrees solely to eliminate contaminants. However, this step cannot be equated with the thermal etching step at significantly higher temperature disclosed by Peloschek.

The Hill patent does not speak to a process of manufacturing magnetic recording heads. The only relevance it has to this litigation is its disclosure that glass is a liquid and will behave in accordance with the principles of capillary action.

The capillary action prior art, De Jean, Feinberg, and the German patent, differ from the Peloschek invention in that in each the precision and reproducibility of the gap length is not critical. Rather, the spaces to be filled are random. The substance of the Peloschek invention, in contrast, is directed at attaining reproducible minute gaps within close tolerances.

The claims of the Grant patent seem to read most directly on the Peloschek method. The two distinguishing features are the circular configuration of the magnetic members and the apparent irrelevance of the size of the gap. Although in Grant the space between the magnetic members is fixed in size at the

6. The formula for determining the extent of capillary flow is:

$$h = \frac{2T \cos \alpha}{r \cdot p}$$

where $T$ = surface tension; $\alpha$ = wetting angle; $r$ = ½ the width of the channel; and $p$ = the density of the liquid.

conclusion of the process, there is no attempt to attain a predetermined gap size.

Thus, it is apparent that none of the prior art shows all the elements of the Peloschek process. The differences between the Duinker "sandwich" process and the Peloschek process are that the glass is moved from inside the gap to just adjacent to it and that instead of only one ferrite face being in contact with the shims both are. In the former, pressure is used to force the glass to fill the gap whereas in the latter capillary action does the job. The prior art indicates the widespread use of capillary action to fill minute gaps but in none is the precise size of the gap of great importance or predetermined. The question, however, is not whether the precise invention is disclosed by the prior art, for then there would be novelty, but rather whether in light of the prior art the invention as a whole would be obvious to one skilled in the art. *Graham v. John Deere & Co., supra*; *Koppers Co., Inc. v. S & S Corrugated Paper Machinery Co., supra*; *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc., supra*; *Formal Fashions, Inc. v. Braiman Bows, Inc., supra.*

In order to apply this standard, the level of skill in the pertinent art must be ascertained. Plaintiff contends that the pertinent art is that of magnetic recording, particularly ferrite recording heads. Defendants, on the other hand, contend that the pertinent art is the glass or glass and ceramic bonding technology. The Court finds that the pertinent art is the glass and glass bonding art. The problem to which the Peloschek patent is directed is that of manufacturing rather than high frequency recording technology. The problems posed by developing an economical method of manufacture were mechanical problems of working with glass and bonding glass to ferrite. Recording head efficiency and design were not the immediate concern of the Peloschek patent and the patent contains no disclosures directed toward improving ferrite recording head efficiency and design. Accordingly, the most pertinent art to the problem posed is that of glass bonding technology.

Although the question is a close one, the Court holds that the Peloschek invention would not have been obvious to one skilled in the art at the time it was made. The crucial feature, in the Court's view, is the use of capillary action to fill a preset gap of precise, reproducible dimensions. Nowhere in the prior art references cited to the Court is there any disclosure which would make it clear to one skilled in the art that such an application of capillary action would be successful. All of the prior art references disclose the use of capillary action to fill random voids. In none were the dimensions of the void of great importance. The mechanical skill of the calling consists, then, in using capillary action to fill voids the precise dimensions of which are unimportant. Inasmuch as the primary concern of the Peloschek invention is filling a gap whose precise dimensions are significant, it cannot be said that Peloschek is obvious within the standard of 35 U.S.C. § 103.

Defendants had the burden of establishing their defense of patent invalidity for obviousness. After reviewing all the evidence, the Court concludes they have failed to sustain their burden. It is easy to argue, as defendants do, with the always perfect vision of hindsight that the Peloschek invention is fully anticipated by the prior art. For example, once one concludes that capillary action, as disclosed by Grant, can be successfully applied, it is obvious to take Duinker and merely move the glass outside the gap and place the ferrite pole pieces in a confronting relationship.

However, the fact remains that the prior art does not suggest that capillary action would successfully produce gaps of precise predetermined size with reproducibility. Indeed, the Grant patent was issued in 1950 and presumably this prior

art was available to Duinker and the others who sought a method for manufacturing ferrite recording heads. Nonetheless, approximately seven years passed from the filing of Duinker's original patent application to the filing of Peloschek's patent application. During that period, the record discloses four patents for manufacturing glass bonded ferrite recording heads: the two later Duinker patents and the Pfost patent discussed above and a patent to M. Camras, U.S. Patent No. 3,079,470 filed December 21, 1959 and issued February 26, 1963, cited by the patent examiner.[7] Each of these patents utilizes the "sandwich" process of introducing the glass into the gap by pressure. None suggests employing capillary action. Thus, as simple as the invention now appears, the Court cannot conclude that it was obvious to persons skilled in the art when the record discloses that these others endeavored during the seven year period to solve the problem unsuccessfully. As the court in *Timely Products Corp. v. Stanley Arron*, 523 F.2d 288, 294 (2d Cir. 1975) said:

> We can conceive of no better way to determine whether an invention would have been obvious to persons of ordinary skill in the art at the time than to see what such persons actually did or failed to do when they were confronted with the problem in the course of their work. If the evidence shows that a number of skilled technicians actually attempted, over a substantial period, to solve the specific problem which the invention overcame and failed to do so, notwithstanding the availability of all the necessary materials, it is difficult to see how a court

could conclude that the invention was "obvious" to such persons at the time.

Admittedly, the evidence of the "secondary" indicia of non-obviousness is meager. Plaintiff presented some evidence which would tend to indicate that the Peloschek process has enjoyed a degree of contemporaneous commercial success. For example, as will appear more fully below, both Micronetics and Ferroxcube use the capillary process. N. V. Philips, whose employees developed the invention, also, makes some use of the process. There is, also, some testimony indicating that IBM made use of the process at least until 1969. In light of the record, the Court has not attached great weight to the proof offered of commercial success. Nonetheless, the failure of other skilled workers in the field has persuaded the Court to resolve any lingering doubt in favor of upholding the validity of the patent.

Accordingly, the Court holds that the Peloschek patent is valid and non-obvious under § 103.

### C. *Infringement*

As with the Duinker patent, the Court must look to the claims of the Peloschek patent and determine whether the Micronetics process falls clearly within the claims in order to decide whether Micronetics infringes the patent. *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra*, 339 U.S. at 607, 70 S.Ct. 854. Defendants contend only that the Micronetics process does not include the thermal etching step and shims "equal to" the desired gap length.

Each of the claims recites that the spacing members "are equal to" the desired gap length. Turning to the Micronetics products, the following table indi-

---

**7.** In addition, plaintiff introduced two patents, cited by neither the patent examiner nor the defendants, concerning methods of manufacturing ferrite recording heads. Patent No. 3,217,305 to Hanson, issued November 19, 1965 on an application filed July 19, 1962, discloses a slight variation of the sandwich process consisting of grooving the ferrite faces. Patent No. 3,188,400 to Vilensky, issued June 18, 1965 on an application filed January 9, 1961, discloses a different manufacturing method. It teaches the coating of the ferrite faces with a glass and ferrite compound and, then, heating to fuse the two separate pieces. Including plaintiff's cited prior art, there are in fact 6 different patents in the trial record concerning ferrite head manufacture prior to the Peloschek patent.

cates the relationship between the shim heights and the gap length desired by the customer for the various Micronetics part numbers:

| <u>A</u> | <u>B</u> | <u>C</u> | <u>D</u> | <u>E</u> |
|---|---|---|---|---|
| Shim Height | Desired Gap Length | Illustrative Part No. | Illustrative Bonded Bar No. | I–Bar No. |
| .0029"–.003" | .0024"–.0036" | 30134 | 30162 | |
| 114–118u"[8] | 80–115u" | 30093 | 30104 | 40003[9] |
| 114–118u" | 80–120u" | 30316 | 30104 | 40003 |
| 114–118u" | 85–115u" | 30037 | 30104 | 40003 |
| 114–118u" | 95–120u" | 30041 | 30104 | 40003 |
| 114–118u" | 90–120u" | 30005 | 30101 | 40003 |
| 115–117u" | 85–115u" | 30023 | 30107 | 40017 |
| 115–117u" | 90–110u" | 30064 | 30107 | 40017 |
| 115–117u" | 90–120u" | 30060 | 30103 | 40025 |
| 158–164u" | 130–160u" | 30280 | 30182 | 40074 |
| 542–562u" (Write Gap) | 450–550u" | 30245 | 30309 | 40086 |
| 147–157u" (Read Gap) | 100–150u" | 30245 | 30309 | 40086 |
| 500–560u" | 400–600u" | 30156 | 30155 | 40037 |
| 60–64u" | 45–65u" | 35012 | 35021 | 45014 (C–Bar) |

Column B in the table represents the gap length desired by the customer. As can be seen, all of the specified customer gap lengths are given as a range. Precision of measurement at these minute dimensions is not possible. Thus, there is always a certain tolerance, or permissible deviation, from any precise numerical value. As can be seen from Column A, all the Micronetics products fall within the specified range or outside the range by a few micro-inches. The only possible exception to this may be the "write gap" of part number 30245 in which the upper range of the shim height exceeds the upper range of the gap desired by 12 micro-inches. In light of the allowances which must be made for the imprecision of measurement, the shim height must be deemed equal to the desired gap length when it falls within the customer's specified range or outside the range by only a few micro-inches.

Defendants contend that the height of the shims exceeds the desired gap length and that the shims are compressed during the manufacturing process. Even if the Court could agree with this contention, which it does not, it would still be constrained to conclude that the Micronetics shims are equal to the desired gap because they fall within or close to the specified range. Accordingly, the Court holds that the Micronetics manufacturing process infringes claims 1 through 4, 6, and 8 through 11 of the Peloschek patent. Insofar as the "write gap" of part number 30245 may not be deemed as falling literally within or close to the desired gap length range, the Court holds that the deviation is so insubstantial as to be the equivalent of the Peloschek invention and thus infringes under the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra.*

8. The symbol u" as used in the table stands for micro-inches.

9. The shims are deposited on the I-bar ferrite piece.

468

Claims 5, 14 and 15 contain, as a further limitation, the preliminary step of thermally etching the ferrite bars prior to assembly. Thermal etching as used in the patent is the process whereby the ferrite bars are heated to a temperature of between 800 and 1000 degrees centigrade for a period of time and then allowed to cool producing ferrite grain boundaries which are visible with the assistance of the proper equipment. Defendants employ a preliminary "bake out" step for a combination of temperature and time which is less than that which produces visible grain boundaries. They contend that their "bake out" step is merely to remove contaminants and does not constitute thermal etching.

The Court finds that plaintiff has failed to sustain its burden of proof of infringement of those claims which include the thermal etching step. One of the co-inventors testified that thermal etching as used in the patent refers to producing visible ferrite grain boundaries. Photographs of Micronetics' ferrites after the "bake out" step were introduced into evidence and they do not exhibit the grain boundaries visible in thermally etched cores. Additionally, the Pfost patent discloses a pre-heating step such as that performed by Micronetics for the purpose of removing contaminants. Accordingly, the Court concludes that the Micronetics process does not include the thermal etching step and that claims 5, 14 and 15 of the Peloschek patent are not infringed.

VI. *Liability of Ned W. Buoymaster*

Defendant Buoymaster is president of Micronetics and one of the four founders of the corporation. Plaintiff contends that Buoymaster actively induced the infringement of the two patents in suit and is personally liable as an infringer.

■ A corporate officer is generally not personally liable for an infringement when he acts solely within his duties as an officer and director. *Powder Power Tool Corp. v. Powder Actuated Tool Co.,* 230 F.2d 409, 414 (7th Cir. 1956); *Claude Neon Lights, Inc. v. American Neon*

*Light Corp.,* 39 F.2d 548 (2d Cir. 1930); *Upjohn Co. v. Italian Drugs Importing Co.,* 190 F.Supp. 361 (S.D.N.Y.1961).

However, where a corporate officer exceeds his executive duties and deliberately organizes a corporation for the purpose of infringing a patent, or where he otherwise acts as the moving, active, conscious force behind an infringement, he may be held personally liable. *Upjohn Co. v. Italian Drugs Importing Co., supra* at 367.

*See also, Marks v. Polaroid Corp.,* 237 F.2d 428, 435 (1st Cir. 1956).

Buoymaster founded Micronetics, along with three others, in April, 1969. The evidence establishes that the corporation was formed to produce materials, including ferrites, for use in highly technical electronics applications. There is no evidence to suggest that Micronetics was formed with the specific intent to manufacture glass-bonded ferrite recording heads. Nonetheless, soon after the formation of the corporation, it entered the market for glass-bonded ferrite cores.

Buoymaster is a large shareholder in Micronetics, although by no means a majority shareholder, and serves on the four man Board of Directors which manages the corporation.

■ Plaintiff has failed to sustain its burden of proving that Buoymaster acted in excess of his authority as an officer and director of Micronetics. The evidence shows only that Buoymaster was the chief administrative officer of the corporation. As such he was involved in the business aspects of corporate affairs and not in the technical production phase. He may have made the decision to offer for sale glass-bonded ferrite heads but he was familiar with the manufacturing process only in a general way. He in no way directed or instigated the infringing method of manufacture. Compare *Marks v. Polaroid, supra; Dean Rubber Mfg. Co. v. Killian,* 106 F.2d 316, 320 (8th Cir. 1939), *cert. denied,* 308 U.S. 624, 60 S.Ct. 380, 84 L.Ed. 521 (1940). There is no evidence to suggest that Buoymaster willfully

participated in the infringement of plaintiff's patent. Accordingly, the Court holds that Buoymaster is not personally liable for infringement.

### VII. *Conclusion*

In sum, plaintiff is entitled to judgment declaring Peloschek patent claims 1, 2, 3, 4, 6, 8, 9, 10 and 11 valid and infringed, and claims 5, 14 and 15 valid but not infringed. Additionally, plaintiff is entitled to a permanent injunction prohibiting infringement of the Peloschek patent. Defendants are entitled to a judgment declaring the Duinker patent invalid. The stay of the counterclaims is vacated and the parties are directed to proceed to the adjudication of the counterclaims and the issue of damages.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed. R.Civ.P.

Settle judgment on notice.