**Billy Gene PUGH et al.**

v.

**Charles H. ROE, d/b/a Life Saving Equipment Repair Company and Life Saving Equipment Repair Co., Inc.**

Civ. A. No. 74–202.

United States District Court,
W. D. Louisiana,
Lafayette Division.

Aug. 11, 1977.

C. Emmett Pugh, Pugh & Keaty, New Orleans, La., for plaintiff.

Jack W. Hayden, Houston, Tex., for defendant.

## MEMORANDUM OPINION

W. EUGENE DAVIS, District Judge.

This is a suit for injunctive relief and damages sought as a result of alleged infringement of two patents. The trial on validity and infringement was completed on July 21, 1977. Previously an evidentiary hearing was held on defendants' special defenses of laches and estoppel, which were overruled.

### I. GENERAL FACTUAL BACKGROUND

Plaintiff, Billy Gene Pugh, is the holder of the two patents involved in this suit. The first patent, # 2,827,325, (hereinafter referred to as Patent 325) covers a personnel and cargo landing net.[1]

The second patent, # 3,165,346 (hereinafter referred to as Patent 346) is a combination patent on a device which adds a stabilizer to the personnel and cargo landing net covered by the earlier Patent 325.[2]

Defendant, Charles H. Roe, operating through his corporation, Life Saving Equipment Repair Company, Inc., manufactured

---

1. A copy of this patent is attached as Appendix A.

2. A copy of this patent is attached as Appendix B.

and sold stabilized personnel nets from 1968 to present.

During the mid-1950's, plaintiff, a resident of Corpus Christi, Texas, was engaged in the shipbuilding business and owned and operated crewboats serving the offshore industry.

A serious accident, resulting in injuries and death, occurred on an offshore rig, the MR. GUS, in March, 1955, while personnel were being transferred from a vessel to a rig. The owner of the MR. GUS consulted Pugh and asked that he attempt to devise a safe method to transfer personnel and equipment between vessels and offshore drilling rigs.

Pugh designed a rope basket and on October 11, 1955, submitted a pro se application for a patent on the device.

Pugh, in his pro se application, disclosed a rope cage consisting of upper and lower spreader rings connected by vertical lines which in turn were connected with horizontal rope lacings. The drawing attached to the application depicted a basket cylindrical in shape.

Pugh, in his original application, claimed:

"The combination of ropes, or lines spread with metal hoop or rings and secured together so as to form a cage or shape whereby men and cargo can be transferred safely to and from one level to another and flexible enough to allow a quick entrance and exit especially from one floating or moving object to another object either floating or fixed." [3]

Pugh's original application was rejected for lack of formality.[4]

Following this rejection, Pugh engaged a patent attorney, who filed an amended application describing the claims of the inventor in more precise terms.[5]

Patent 325 issued on March 13, 1958.[6]

Pugh began producing the cylindrical nets in 1956 and met with considerable commercial success.

During 1958, in response to customer demand, Pugh changed the shape of his net from cylindrical to conical. In the cylindrical net, the diameter of the top and bottom rings were the same. In the conical net, the base ring was larger in diameter than the top ring and the lines sloped upward from the base ring to make their connection with the top ring.

This change in configuration was made so that personnel could more safely ride on the outside of the net during transfer.

In 1961, Roe was engaged in the business of renovating and repairing life floats, life ring buoys, life preservers and other safety equipment. He later organized Life Saving Equipment Repair Company, Inc., and about this same time began repairing Pugh

---

3. Page 5, Exhibit D–22.

4. Page 6, Exhibit D–22.

5. "1. A personnel or cargo net comprising, a base spreader ring, an upper spreader ring, means stretched across and carried by said base spreader ring for supporting personnel or cargo between the perimeter of said base ring, circumferentially spaced longitudinally extending flexible lacings connecting the perimeter of the base ring to the perimeter of the upper ring, means carried by the upper ring for attaching a supporting element, circumferentially extending flexible lacings connected to said longitudinally extending lacings at spaced intervals along lengths thereof to provide a flexible netting substantially enclosing the area between the two rings, and said circumferentially extending lacings being omitted between two adjacent longitudinally extending lacings whereby an opening of greater lateral dimension than the space between the taut adjacent longitudinal lacings is formed for entry or exit of personnel or cargo when the rings are positioned closer to each other than in the taut condition of the longitudinal lacings.

2. A personnel or cargo net according to claim 1, wherein the circumferential lacings are omitted at diametrically opposite areas between two adjacent longitudinal lacings."

6. Exhibit P–1 attached as Appendix A. The claims are enumerated in Column 2, lines 22–64.

nets. His initial personnel net repair activities consisted of replacing the netting and adding canvas wraparounds to the rings. Sometime later he began straightening, sandblasting and painting the rings of used personnel nets. In 1966, Mr. Roe constructed his first stabilizer assembly for use with a personnel net. In 1968, Roe began the manufacture of a complete net with new or rebuilt rings. Since that time, defendants have developed a substantial business volume from manufacture and sale of new stabilized personnel nets.

## II. *PATENT 325*

Defendants deny the validity of this patent and also deny that they infringed the patent. Defendants also assert the defense of file wrapper estoppel.

## A. VALIDITY OF PATENT 325

Defendants assert that the invention disclosed in this patent was obvious within the meaning of 35 U.S.C. § 103.

█ I conclude that the personnel and cargo net disclosed and claimed in Patent 325 was a non-obvious advance in the art.

This conclusion was supported by defendants' expert, Dr. J. V. Pennington.

The cargo net depicted in Defendants' Exhibit 209–A did not render the Pugh net obvious.[7]

Plaintiff produced convincing evidence of a critical need by the offshore oil industry for a safer means of transferring personnel between vessels and platforms. The evidence also established that the Pugh net fulfilled that need. Several representatives of the offshore oil industry testified unequivocally that the Pugh net represented a significant improvement over older methods used to transfer personnel. Prior to the advent of the Pugh net, personnel were required to either swing on a single line or ride a cargo net similar to the net depicted in defense Exhibit 209–a. The Pugh net, with certain modifications and improvements, continues to be almost universally used in the offshore oil industry to transfer personnel between vessels and platforms in moderate to heavy seas.

Defendants have failed to establish that the Pugh personnel net disclosed in Patent 325 was obvious within the meaning of 35 U.S.C. § 103 or under the tests enunciated in *Graham v. John Deere*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

## B. INFRINGEMENT OF PATENT 325

The defendants contend, first, that they did not infringe this patent because the Roe net uses tapered ropes instead of vertical ropes. Defendants argue that the net disclosed in Patent 325 is a cylindrical net with vertical ropes or lines rather than a net conical in shape. Defendants argue, primarily from language contained in the file wrapper, that "vertical" and "longitudinal" were used synonymously and the net as claimed is limited to a cylindrical net with vertical lines.

Defendants' expert, Dr. Pennington, conceded that longitudinal in its plain sense means "lengthwise." He testified, however, that several provisions found in the file wrapper operated to alter the plain, ordinary meaning of "longitudinal."

In plaintiff's original pro se application, plaintiff disclosed the original specifications:

"The *vertical* ropes or lines 4 . . . . "[8]

When plaintiff engaged a patent attorney to present his application following re-

---

**7.** The cargo net depicted in this exhibit has no upper or lower rings which give the net in Patent 325 a definitive shape and also adds rigidity to the net. The only similarity between the two devices is the longitudinal netting.

However, the Pugh net represented a marked improvement over the cargo net from the standpoint of utility as well as safety.

**8.** Defendants' Exhibit 22, P. 5, Line 1.

jection, the specifications were disclosed as follows:

> "The longitudinally or vertically extending ropes 4 . . . "[9]

Defendants also urge that the drawing which forms a part of the disclosure in Patent 325 clearly depicts vertical lines as opposed to tapered or sloping lines.[10]

Defendants contend, therefore, that longitudinal, as used in the claim, is synonymous with "vertical."

This interpretation of longitudinal urged upon us by defendants is strained. The language contained in the various documents forming the file history does not require that we imply a meaning to longitudinal which the word in ordinary usage does not have.[11]

It seems patently unreasonable to impute an intent to plaintiff to limit his claim to a cylindrical net with vertical lines when several of the references to prior art cited by the patent examiner related specifically to cylindrical devices rather than to conically shaped devices.

I find, therefore, that Patent 325 reads on the Roe net despite the fact that the Roe net utilizes sloping or tapered lines rather than vertical lines.

Defendants' second argument is that their net does not infringe on the Pugh net because the openings in the Roe net are 20 to 24 inches wide at the base whereas the openings in the Pugh net have a width of 12 to 14 inches.

Again, defendants point to language in the file wrapper to support their interpretation.

Several provisions in the specifications and file history refer to the Pugh net as a "cage."[12] The file wrapper also contains several references to the fact that when the longitudinally extended lacings are taut the opening is of such small dimensions as to prevent the escape of certain types of cargo or individuals.[13]

Finally, defendants point to the final phrase in the specifications forming a part of Patent 325 which provides an opening in the net:

> " . . . of greater lateral dimensions than the space between taut adjacent longitudinal elements is formed when the rings are positioned nearer to each other than in the taut condition of the longitudinally extending elements."[14]

In summary, defendants urge that the device described in the specifications and the file wrapper is a device either without openings at all or with such small openings that an individual cannot enter or exit the net while the longitudinal ropes are taut. Defendants argue that the net disclosed and claimed was designed to transport cargo and personnel inside the net so that such passengers or cargo could not escape until the net was brought to rest on a deck and tension relieved in the ropes.

---

**9.** Defendants' Exhibit 22, P. 16, Lines 1 and 2; plaintiff's Exhibit 1, Col. 1, Line 70, Patent 325.

**10.** See Appendix A.

**11.** *Harrington Mfg. Co., Inc. v. White*, 475 F.2d 788 (5th Cir. 1973), which states:
"Letter patents serve to foster the constitutional mandate to promote the arts and sciences. If courts undermine the rights of patentees, not by a narrow construction of the scope of the invention, but rather on the basis of semantical facades, then the utility of a patent as a stimulus for greater public disclosure of private inventiveness will be greatly minimized and more inventors will resort to whatever protection the trade secrecy law may afford." (p. 801)

**12.** Plaintiff's Exhibit 1, Column 1, lines 24, 72; defendants' Exhibit 22, P. 5, lines 2, 12; P. 16, line 3.

**13.** Defendants' Exhibit 22, P. 5, line 2; P. 8, lines 1 through 5; P. 9, lines 4 through 7; P. 14, lines 3 through 6.

**14.** Plaintiff's Exhibit 1, Column 2, line 60.

Defendants argue that the Roe net, on the other hand, was designed to permit passengers to ride on the outside of the net with openings to permit ready entry in the event of danger.

Plaintiff also directs us to portions of the file wrapper. First, he points to the drawing which forms a part of the disclosure. The drawing clearly indicates an opening adjacent to two taut longitudinal lines. Plaintiff also points to a statement of petitioner's attorney in his application in which plaintiff's patent attorney stated as follows:

"The ropes forming one of the openings 5 the net of this application is of such width when the longitudinal lacings 4 are taut as to prevent the *inadvertent* escape of an individual or packages of cargo." [15]

Dr. Pennington, defendants' expert, was questioned at length with respect to whether the openings in the Pugh net displayed in the courtroom were a permissible variation from the Pugh Patent 325. Dr. Pennington conceded that the openings in the conical Pugh net were a permissible variance from the literal terms of Patent 325. The openings in the Pugh net are 12 to 14 inches wide at the base of the net. The net was displayed in a taut condition during the trial and it was demonstrated to my satisfaction that personnel could enter and exit with relative ease through that opening.

The opening in the Roe net, also displayed in the courtroom in a taut condition, had openings of 20 to 24 inches at the base of the net.

I viewed the two nets manufactured by plaintiff and defendants throughout the trial. The Roe net is essentially a carbon copy of the conical Pugh net except that the openings in the Roe net are 20 to 24 inches wide. Both nets performed the identical function in essentially the identical manner. I am unable to perceive any rational basis in fact or law as to why the larger openings in the Roe net prevent it from infringing on Pugh Patent 325.[16]

The next defense offered by defendants is the defense of file wrapper estoppel.

Defendants, in asserting this defense, essentially restate, in slightly different form, the argument made in support of their denial that the patent was infringed. Defendants argue that plaintiff disclosed a device which was a) a cylindrical net with b) no openings or very limited openings. Defendants urge that the plaintiff having described and claimed such a device is estopped from now claiming that the net manufactured by Roe, which is of a conical shape with wide openings, is covered by the Patent 325.

Our reasons for holding that the Roe net infringed Patent 325 also dispose of this contention. The strict interpretation which defendants would have us give the language in documents which comprise the file history is simply not warranted.

## III.   *PATENT 346*

### A.   FACTUAL BACKGROUND

After the Pugh net had been in operation for several years, Pugh was consulted by Mr. Charles Howe with Ocean Drilling & Exploration Company with respect to a problem encountered in the field in connection with the operation of the net. The problem Mr. Howe presented to Pugh was that when the personnel net was lowered to the deck of a boat riding in moderate to heavy seas, it was difficult, if not impossible, for the crane operator to keep the precise amount of tension needed on the crane line to maintain the net in an erect position. With the net in a partially collapsed position it was difficult and hazardous for personnel to enter or exit the net. Thus, the problem presented was how to maintain the net in an erect position while the base of the net was sitting on a bobbing boat deck.

To solve this problem, Pugh devised a mechanism which he called a "stabilizer."

Pugh then made application for a combination patent covering the net (subject of Patent 325) and the stabilizer.

**15.** Defendants' Exhibit 22, P. 19, lines 21 through 24.

**16.** *Autogiro Company of America v. United States*, 384 F.2d 391, 181 Ct.Cl. 55 (1967).

Jan. 12, 1965            B. G. PUGH            3,165,346

LIFTING HARNESS FOR LANDING NET

Filed Nov. 20, 1962

FIG.1

FIG.2

FIG.3

As reflected by the above drawing of the stabilizer, Line 27 represents the inflexible member in this unit. Line 27 is a rope or cable sufficient to bear the load intended to be carried in the basket. The elements marked 31 and 32 represent elastic members constructed of rubber or similar material. As is evident from the drawings, Element 27 is of greater length than Elements 31 and 32.

Pugh designed the combination of Element 27 on the one hand and Elements 31 and 32 on the other so that their relationship was such that when the personnel net was seated on a bobbing boat deck the flexible Elements 31 and 32 held the net erect. The Elements 31 and 32 have sufficient flexibility that after the net is brought to rest on the deck the entire net will continue to remain erect while the boat travels from the crest to the trough of a wave.

When the entire net is lifted from the deck, the stabilizer is designed so that the elastic Elements 31 and 32 elongate to a length equal to the length of the inflexible rope or cable. At this point, the inflexible rope or cable (Element 27) comes into play and takes over the load-carrying function. Pugh's stabilizer had the flexible and inflexible lines in such a relationship as to permit the flexible members to support the weight represented by the upper portion of the net when the base of the net was at rest; yet when the entire net was lifted from the deck of a vessel the additional weight was supported by the inflexible member. Under this arrangement, the only weight-bearing function performed by the flexible member was to support the weight of the net above the base ring. Thus, the device had the advantage of preventing the collapse of the net while the net was resting on a bobbing boat deck; yet the flexible members carried no significant portion of the load when the net was lifted from the deck.

## B. VALIDITY OF PATENT 346

### 1. Obviousness

Defendants claim that the stabilizer was obvious when compared with the prior art.

Defendants admit, however, that the references to prior art raised by the patent officer are the most relevant references. Defendants also admit that the most pertinent reference is the Supina patent No. 2,462,-234. (Exhibit D–15) The Supina patent is attached as Appendix C.

The device described in Supina as well as numerous other references considered are termed "shock absorbers" or "snubbers." Supina and the other related references operate on the principle that the elastic member operates to bear an initial, sudden load so as to cushion the effect that such a shock load would have on the inflexible weight-bearing line.

The object of the stabilizer in Patent 346 is to arrange the flexible and inflexible members in such a relationship as to bind the load-carrying inflexible line to the load and, while maintaining such a connection, maintain enough flexibility to hold the upper net erect while the entire net, seated on the deck, travels with the bobbing boat. Also, the Pugh stabilizer is designed so that the flexible elements are never required to bear any significant weight or load. This function is performed by the inflexible load line. Herein lies the difference between Pugh's stabilizer and the Supina shock absorber. The shock absorbers used as references bear significant loads and are designed to protect the inflexible member of that unit from sudden shock loads. The shock absorber is designed to bear the greatest amount of force expected to be exerted by the load. The Pugh stabilizer operates on an entirely different principle. In the Pugh stabilizer, the flexible member of that unit is prevented from supporting any significant load. Its function is to provide flexibility rather than to operate as a load-carrying member.

There are obvious similarities between the Supina shock absorber and the Pugh stabilizer. The difference, of course, is in the relationship between the flexible and inflexible lines. The question presented here is whether one skilled in the art and having working knowledge of shock absorbers and snubbers which preceded the Pugh

stabilizer would have been led to the solution offered by the stabilizer in Patent 346.

I am convinced from the testimony that one skilled in the art would not have been led to the solution which Patent 346 offers to the problem presented.

William B. Ogletree, a registered engineer, was consulted by Pugh in 1961 while he was attempting to refine his idea for the stabilizer. Pugh explained to Ogletree his basic idea for the stabilizer. Pugh asked Ogletree to prepare a written description of the device which would be understandable to an engineer. Ogletree had the impression that Pugh was describing a classic shock absorber and prepared a written description of such a device. When Pugh reviewed the description, he immediately advised Ogletree that this was not a correct representation of his idea. Pugh then took Ogletree to his shop and, with the use of elastic and inelastic members, demonstrated to Ogletree his concept for the Pugh stabilizer. It was only at this point that Ogletree grasped the idea which was the basis of the Pugh stabilizer.

After Pugh constructed a model and refined his idea, he contacted Mr. Howe with ODECO and reported to him that he had a solution to the problem. Pugh then verbally described the operation of his stabilizer. Mr. Howe was singularly unimpressed. Mr. Howe, who had some engineering background and had been a safety engineer with ODECO since the inception of the offshore oil business, was familiar with attempts to meet the problem with a shock absorber-type device. His immediate reaction to Pugh's suggestion was that he did not want his personnel being transported in a basket supported by elastic members.

Pugh was able to convince Howe to allow him to demonstrate his stabilizer. Pugh installed a stabilizer on one of his nets and demonstrated it in the field to Howe. It was only after the demonstration that Howe understood the principle by which the stabilizer was to work.

The only evidence which counters the testimony of Ogletree and Howe is the testimony of Dr. Pennington. Dr. Pennington simply testified that the Pugh stabilizer would have been obvious to one trained in the art in light of the teachings of Supina and the other similar shock absorber-type devices. The weight of the evidence convinces me to the contrary.

All we are called upon to decide here is whether the stabilizer, when used in combination with the personnel net and a lifting means, was an advance in the art.

█ In this unique application, I find that the stabilizer is a non-obvious advance in the art. When used with a Pugh net, the stabilizer operates in connection with a divided load. The base ring is resting on a deck. The balance of the load is a collapsible net. The stabilizer is utilized to maintain the upper load in an erect position and bind the load to a lifting means in a flexible fashion so that when the load moves on a bobbing deck, the upper load or collapsible net remains in an erect position while the lower load (base ring) remains stationary on the bobbing deck.

### 2. Insufficient Disclosure

The only other substantial argument offered in support of its argument that 346 is invalid is that the patent fails to disclose sufficient detail to enable one skilled in the art to construct the stabilizer. Defendants argue that the disclosure in 346 does not reveal the relationship between the elastic and inelastic members so that one skilled in the art could construct the device.

I find that adequate detail was disclosed with respect to the stabilizer. The relationship between the flexible and inflexible lines depends upon the weight of the net and the weight distribution between the base ring on the one hand and the upper portion of the ring on the other. Additionally, the elastic qualities of the particular elastic element used is a factor which must be considered by one intending to construct

a stabilizer. Disclosure of the functional qualities of the stabilizer were sufficient to enable one skilled in the art to construct the device after determining the weight of the net to which the stabilizer is to be attached and after determining the elastic qualities of the material intended to be used as the elastic element.

### 3. Holmes' Claim of Invention

Charles Holmes claimed credit for the idea of the personnel net stabilizer. To the extent that there is a conflict in the testimony, I accept the testimony of Billy Pugh and find from a preponderance of the evidence that the stabilizer was the invention of Billy Pugh.

## C. INFRINGEMENT OF PATENT 346

The only remaining question presented as to infringement of Patent 346 is whether this patent reads on the stabilizer which Roe manufactures and sells as an integral part of his stabilized personnel and cargo net.

Since 1966, Roe has manufactured several types of stabilizers, all of which vary slightly from the Pugh stabilizer.[17]

The stabilizer claimed and protected by Patent 346 is a device which consists of elastic and inelastic members. These members are arranged in such a relationship so that when used with the cargo and personnel net, the entire unit functions as outlined above.

All of the Roe stabilizers are constructed so as to function in precisely the same man-

ner as the stabilizer disclosed and claimed in Patent 346. I find that the particulars by which the Roe stabilizer varies from the Pugh stabilizer are not significant and that the infringement of 346 by defendants has been established by an overwhelming preponderance of the evidence.

## IV. PERSONAL LIABILITY OF CHARLES ROE

■ The evidence reveals that Charles Roe and his wife are the sole stockholders of Life Saving Equipment Repair Co., Inc. As its executive officer, he actively conducted the day-to-day affairs of the small corporation, including the building of the personnel nets and stabilizers which infringed the Pugh patents. Defendant Charles Roe is liable, along with his corporation, for all damages which flow from the infringements sued upon herein. *U. S. Philips Corp. v. National Micronetics, Inc.*, 410 F.Supp. 449 (S.D.N.Y.1976).

## V. CONCLUSION

For the reasons set forth herein, we find that defendants have failed to establish the invalidity of either patent in suit and further find that defendants have infringed both patents.

Plaintiff is directed to submit an appropriate interlocutory order and judgment in accordance with this opinion within 15 days. Defendants shall have five days from date of submission to file written objections as to form of the interlocutory judgment.

---

**17.** The various models of the Roe stabilizer differed from the Pugh stabilizer: a) in the manner in which the elastic and inelastic members were attached to the common rings; b) the type elastic material used; c) in the number of individual elastic strands used; d) in the use of a long single elastic strand wrapped several times between the two rings rather than the use of numerous individual strands connecting the two rings. (See Defense Exhibits 93–A, 94–A and 183–A).

# United States Patent Office

**2,827,325**
Patented Mar. 18, 1958

**1**

2,827,325

**PERSONNEL AND CARGO LANDING NETS**

Billy Gene Pugh, Corpus Christi, Tex.

Application October 11, 1955, Serial No. 539,857

3 Claims. (Cl. 294—77)

The invention relates to improvements in personnel and cargo nets in which individuals or inanimate material may be transferred from one ship to another or from a ship to a stationary platform. The net is designed to be supported by a flexible hoisting cable actuated by a crane or the like.

An object of the invention is to provide a net assembly formed of at least two spreader rings with lacings or ropes extending longitudinally of the device connecting circumferentially spaced portions of the rings to each other with circumferentially extending lacings or ropes to provide a cage with the circumferentially lacings omitted between two adjacent longitudinally extending ropes so that when the longitudinally extending lacings are taut the opening is of such small dimensions as to prevent the escape of certain types of cargo or individuals.

Other objects and features of the invention will be appreciated and become apparent as the present disclosure proceeds and upon consideration of the annexed drawing and the following detailed description wherein an embodiment of the invention is disclosed.

The drawing represents a perspective view of a personnel and cargo landing net exhibiting the invention.

The device is provided with a flexible cable or rope 1 having an eyelet in the upper end which may be arranged over a hook or the like carried by a hoisting cable so that the personnel or cargo landing net may be readily lifted and moved. The net assembly includes two metal spreader rings 2 and 3. The base spreader ring 3 may be wrapped or covered in any suitable manner so as to cushion the bottom of the device against impact when the net is lowered onto a loading deck or the like. The area embraced by the base ring 3 is closed by suitable means such as lacings 6 which extend in chordal directions with reference to the circumference of the base ring 3. The bottom may be closed in any suitable manner so as to provide a strong flexible bottom which will support the weight of several individuals or a load of cargo.

A plurality of longitudinally extending lacings or ropes 4 extend from the upper spreader ring 2 to the base spreader ring 3. The lacings or ropes 4 are circumferentially spaced from each other and are connected to the rings 2 and 3.

The net structure includes circumferentially extending flexible lacings 7 which are connected to the longitudinally extending lacings or ropes 4 at spaced intervals along the lengths thereof. The lacings 7 are omitted between two adjacent longitudinally extending ropes 4 to provide an opening 5. The circumferentially extending lacings 7 may be omitted between at least two other adjacent longitudinally extending ropes to provide a second opening 5.

Suitable means is provided for connecting the upper spreader ring to the cable or rope 1 and such means may take the form of ropes 8 which converge towards each other in proceeding upwardly from the ring 2.

The longitudinally or vertically extending ropes 4 and the circumferentially or normally horizontally extending ropes 7 form a cage to keep individuals or cargo within

**2**

the net structure while the longitudinally extending lacings 4 are taut or while the net is being supported by the cable 1 during transfer of the net from a loading station to a discharge station. When the bottom of the net assembly is resting or supported on a firm surface a downward movement of the upper spreader ring 2 relative to the base spreader ring 3 will cause the longitudinally extending lacings 4 to flex whereby either of the openings 5 may be laterally enlarged to permit the entry or removal of cargo or the entry or exit of individuals from within the net.

While the invention has been described with reference to specific structural features and with regard to use of particular materials it will be appreciated that changes may be made in the overall organization as well as the structural elements. Such modifications and others may be made without departing from the spirit and scope of the invention as set forth in the new claims.

What I claim and desire to secure by Letters Patent is:

I claim:

1. A personnel or cargo net comprising, a base spreader ring, an upper spreader ring, means stretched across and carried by said base spreader ring for supporting personnel or cargo between the perimeter of said base ring, circumferentially spaced longitudinally extending flexible lacings connecting the perimeter of the base ring to the perimeter of the upper ring, means carried by the upper ring for attaching a supporting element, circumferentially extending flexible lacings connected to said longitudinally extending lacings at spaced intervals along lengths thereof to provide a flexible netting substantially enclosing the area between the two rings, and said circumferentially extending lacings being omitted between two adjacent longitudinally extending lacings whereby an opening of greater lateral dimension than the space between the taut adjacent longitudinal lacings is formed for entry or exit of personnel or cargo when the rings are positioned closer to each other than in the taut condition of the longitudinal lacings.

2. A personnel or cargo net according to claim 1, wherein the circumferential lacings are omitted at diametrically opposite areas between two adjacent longitudinal lacings.

3. A personnel or cargo net comprising, a base spreader ring, an upper spreader ring, means closing the area between the circumference of the base spreader ring serving as a bottom for the net to support a load over an area defined by the perimeter of said base ring, circumferentially spaced longitudinally extending flexible non-elastic elements connecting the perimeter of the base ring to circumferentially spaced portions of said upper spreader ring, means carried by the upper ring for attachment to a supporting device, circumferentially extending flexible non-elastic elements connected to said longitudinally extending elements at spaced points therealong to provide a flexible netting substantially enclosing the area between the two rings, and said circumferentially extending elements being omitted between at least two longitudinally extending elements whereby an opening of greater lateral dimensions than the space between taut adjacent longitudinal elements is formed when the rings are positioned nearer to each other than in the taut condition of the longitudinally extending elements.

**References Cited in the file of this patent**

UNITED STATES PATENTS

| | | |
|---|---|---|
| 1,085,794 | Bowman | Feb. 3, 1914 |
| 1,088,939 | Snee | Mar. 3, 1914 |
| 1,188,185 | Krulish | June 20, 1916 |
| 1,457,304 | Hodgson | June 5, 1923 |

March 18, 1958            B. G. PUGH            2,827,325

PERSONNEL AND CARGO LANDING NETS

Filed Oct. 11, 1955

INVENTOR

*BILLY GENE PUGH,*

BY

*ATTORNEY*

# United States Patent Office

3,165,346
Patented Jan. 12, 1965

1

2 .

3,165,346
LIFTING HARNESS FOR LANDING NET
Billy Gene Pugh, P.O. Box 802, Corpus Christi, Tex.
Filed Nov. 20, 1962, Ser. No. 238,983
2 Claims. (Cl. 294—77)

The present invention relates to a landing net for personnel or cargo and more specifically pertains to a harness rigging attached to or forming a part of the top portion of such a net to facilitate manipulation of the net during landing operations.

A net structure as disclosed in my Patent 2,827,325 dated March 18, 1958, provides safe means for transferring individuals from a boat to an off shore drilling platform and for transferring personnel from such a rig to a boat and for transferring people from one boat to another and it is an object of the invention to provide a harness rigging in combination with such a net so as to maintain the net in an erect condition during a landing operation when the supporting crane is carried by a boat or when the structure on which the net is to be landed constitutes the deck of a boat.

Another object of the invention is to provide a flexible rigging between the upper end of a landing net and the hoist cable wherein the harness rigging includes an elastic means in which energy is stored while the net and the load thereon is lifted so that when the base portion of the net is supported on the deck of a bobbing boat the energy stored in the elastic means serves to prevent the net from collapsing to thereby avoid the necessity of vigilant manipulation of the hoist cable during such a landing operation.

A more specific object of the invention is to provide a harness forming a part of the support rigging of a landing net which includes an inelastic and flexible element such as a cable or rope having a length which is greater than an elastic means in its undistorted condition so that the elastic means is elongated during the operation of lifting the net and its load by the inelastic element without distorting the elastic means beyond its elastic limit whereby the energy stored in the elastic means is utilized to maintain the net in an upright position during a landing operation when the crane is carried by a bobbing boat.

Another object of the invention is to provide a support harness which comprises elongated flexible elastic means in association with flexible elongated inelastic means having a greater length than the elastic means in the undistorted state of the elastic means including structure to maintain such elastic and inelastic means in assembled relationship.

Other objects and features of the invention will be appreciated and become apparent as the present disclosure proceeds and upon consideration of the accompanying drawing taken in conjunction with the following detailed description wherein an embodiment of the invention is disclosed.

In the drawing:

FIG. 1 is a side elevational view of a lifting harness embodying the invention showing the elastic elements in the undistorted state.

FIG. 2 is a side elevational view on a smaller scale showing the lifting harness in association with a landing net with the elastic means maintaining the net in an upright position.

FIG. 3 is a similar view showing elongation of the elastic elements with the inelastic member supporting the net and its load.

FIG. 4 is an enlarged fragmentary sectional view taken on the line 4—4 of FIG. 1.

The rigging to which the invention pertains has particular utility in combination with a landing net of the type disclosed in my Patent 2,827,325 which is formed of a substantial rigid upper spreader ring 10 and a base spreader ring 11 which may be encased in suitable padding 12. Any suitable structure (not shown) may be provided extending throughout the base spreader ring 11 to provide a floor on which individuals or cargo may be carried. The net includes a plurality of longitudinally extending ropes 14 which extend from the upper spreader ring 10 to the base spreader ring 11. The ropes 14 are circumferentially spaced from each other and connected to the spreader rings. Circumferentially extending ropes 16 are connected to the longitudinally extending ropes 14 at spaced intervals. The ropes 16 are omitted between two adjacent longitudinally extending ropes 14 to provide an opening 19. Another such opening may be provided in the rope lacings. The lateral dimensions of each opening 19 when the longitudinally extending ropes 14 are taut is such as to prevent free exit of an individual from within the net. When the longitudinally extending ropes 14 are no longer taut the flexible character of the lacings is such that each opening 19 may be enlarged to permit individuals to pass therethrough and so that cargo may be loaded into and removed from the net.

A plurality of ropes 18 are attached to the upper spreader ring 10 or these elements 18 may form continuations of the longitudinally extending ropes 14. These cables 18 are connected to a ring shaped member 21 which forms a part of the lifting harness. The rigging or harness includes a loop shaped member 22 which is adapted to be accommodated in a hook 23 carried by a hoist cable 24 which extends over a boom 26 of a crane. The rigging includes a flexible inelastic elongated element 27 such as a rope or cable. This inelastic element 27 is adapted to support the net and its load with the desired factor of safety and constitutes the primary means in lifting the net and its cargo. The ends of the rope or cable 27 may be attached to the ring member 21 and the loop member 22 by means of clevises 28 which are secured to lugs 29 carried by the respective members. The lugs 29 may be welded or otherwise secured to the members 21 and 22.

The elongated flexible element 27 has a fixed length and is inelastic under the loads to which it is subjected in handling and lifting the net and its cargo.

The rigging or harness includes elongated flexible elastic means and in the embodiment shown in the drawing two flexible elastic cords 31 and 32 extend from and are connected to the ring members 21 and 22. These elastic cords 31 and 32 may be of any suitable type and in the undistorted state are of substantially equal lengths and in the undistorted state are of shorter length than the rope or cable 27. The elastic elements may be formed of aircraft bongee cord and when they are elongated to the extent as permitted by the inelastic element 27 do not exceed their elastic limits.

In operation and when the crane and its hoisting cable 24 is supported by a boat which tends to rise and fall with swells or the like upward movement of the cable 24 causes the elastic means as represented by the cords 31 and 32 to be elongated and the longitudinally extending ropes 14 are tensioned. The stretching of the cords 31 and 32 continues until the slack in the rope or cable 27 is eliminated. The net and the load is then supported by the inelastic member 27. This condition of the elements is shown in FIG. 3 and energy is stored in the cords 31 and 32 and their elastic limit is not exceeded when the cable or rope 27 becomes taut to serve as the primary load carrying member. During elongation of the elastic elements 31 and 32 there is a tendency for the net and its cargo to be lifted so that the load of the assembly is not lifted with violent movement as it rises from the surfaces 36.

In lowering the net towards a fixed platform such as

**3**

a drilling rig platform or a dock a condition as depicted in FIG. 2 is attained when the base of the net rests on the fixed surface 38. Then the load is no longer supported by the inelastic element 27. The energy stored in the elastic means 31 and 32 continues to hold the net in an upright position with the longitudinally extending ropes 14 in a substantially taut condition. The energy stored in the elastic cords maintain the net in an erect condition in the event that the boat carrying the crane should lower as a consequence of a swell and the elastic elements 31 and 32 continue to maintain the net in an upright condition without the necessity of manipulating the hoist cable 24. This same desirable result is attained when the crane and its hoisting cable 24 are supported on a fixed base and the landing surface forms a deck of a bobbing boat. In one embodiment the energy stored in the elastic cords 31 and 32 under the condition shown in FIG. 3 amounts to about one hundred and eighty pounds which is sufficient to maintain the ropes 14 of the net in upright positions.

While the invention has been shown and described in connection with particular structure for the net and one type of rigging or harness employing ropes it will be appreciated that various types of elastic and flexible inelastic elements may be employed together with other types of net structures. Such modifications and others may be made without departing from the spirit and scope of the invention as set forth in the appended claims.

What I claim and desire to secure by Letters Patent is:

1. A landing net and lifting harness assembly comprising in combination, a landing net including a base spreader ring and an upper spreader ring with longitudinally extending circumferentially spaced ropes connecting the upper spreader ring with the base spreader ring and circumferentially extending ropes connected to said longitudinally extending ropes providing a flexible netting with said circumferentially extending ropes omitted between two longitudinally extending ropes to provide an opening of limited lateral dimensions in the netting when the longitudinal ropes are taut, a ring shaped member, means connecting said ring shaped member to said upper spreader ring, an inextensible flexible element connected to said ring shaped member, a flexible elastic element connected to said ring shaped member, a loop shaped member connected to the free end of said inelastic element and connected to the free end of said elastic element,

**4**

said elastic element in the unelongated state being of less length than said inelastic element, lifting means engaging said loop member for raising the netting and a load therein during which the elastic element elongates to a length equal to that of the inelastic element, and the energy stored in said elastic element during said elongation being sufficient to maintain said longitudinal extending ropes substantially taut when the base spreader ring supports the landing net with the lifting means lowered to a position where slack develops in the inelastic element.

2. A landing net and lifting harness rigging assembly comprising in combination, a landing net including longitudinally extending flexible lacings and transversely extending flexible lacings providing a netting having an opening between two longitudinally extending lacings of limited lateral extent when the longitudinally extending lacings are substantially taut, an inextensible flexible element connected to an upper portion of said net, a flexible elastic element connected to the upper portion of said netting, said elastic element in the unelongated condition being of less length than said inelastic element, a liftable member connected to the free end of said inelastic element and to the free end of said elastic element, lifting means engaging said liftable member for raising the liftable member and the netting and a load therein during which the elastic element is elongated to a length equal to that of the inelastic element, and the energy stored in said elastic element during said elongation being sufficient to maintain said longitudinally extending lacings upright when the bottom of the netting is supported with the liftable member lowered to a position where the inelastic element is no longer taut.

References Cited by the Examiner

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 2,462,234 | 2/49 | Supina | 244—151 |
| 2,474,124 | 6/49 | Schultz | 244—151 |
| 2,827,325 | 3/58 | Pugh | 294—77 |

FOREIGN PATENTS

914,471   6/46   France.

SAMUEL F. COLEMAN, *Primary Examiner.*
RAPHAEL M. LUPO, *Examiner.*

Jan. 12, 1965      B. G. PUGH      3,165,346

LIFTING HARNESS FOR LANDING NET

Filed Nov. 20, 1962

*FIG. 2*

*FIG. 3*

*FIG. 1*

*FIG. 4*

INVENTOR

**BILLY GENE PUGH**

BY

ATTORNEY

Patented Feb. 22, 1949

2,462,234

# UNITED STATES PATENT OFFICE

2,462,234

## PARACHUTE

Leo E. Supina, Westford, Conn., assignor of one-half to Alfred A. Supina, Stafford Springs, Conn.

Application February 9, 1946, Serial No. 646,659

2 Claims. (Cl. 244—151)

**1**

My invention relates to improvements in parachutes, and specifically to shock absorbing means therefor.

The primary object of the invention is to equip parachutes with efficient means of simple construction for absorbing shock and jar against the canopy and also against the jumper, when the canopy opens, and which acts to cushion landing impact and to assist the jumper in remaining upright in landing.

Another object is to provide means of the character and for the purpose above set forth which is adapted to be easily embodied in present-day parachutes without materially increasing the cost or weight thereof.

To the accomplishment of the above and subordinate objects presently appearing, the preferred embodiment of my invention has been illustrated in the accompanying drawings, set forth in detail in the succeeding description, and defined in the claims appended hereto.

In said drawings:

Figure 1 is a view in front elevation illustrating my improved shock absorbing means embodied in a parachute folded, and packed with the harness applied to a jumper.

Figure 2 is a view in side elevation illustrating the manner in which the shock absorbing means functions when the canopy begins to open.

Figure 3 is a similar view illustrating the manner in which the shock absorbing means functions when the entire weight of the jumper is being sustained by the parachute,

Figure 4 is a fragmentary view in section taken on the line 4—4 of Figure 1 and drawn to an enlarged scale,

Figure 5 is a fragmentary view in front elevation illustrating the manner in which the shock absorbing webs of my invention are connected to the shroud lines, and

Figure 6 is a view in longitudinal section taken on the line 6—6 of Figure 5.

Reference being had to the drawings by numerals, my improved shock absorbing means has been shown therein as forming part of the equipment of a well known type of parachute, illustrated in part as sufficient for the present purposes. The harness of said parachutes includes a pair of shoulder straps, one of which is best shown in Figure 4 and designated 1, with front ends connected by adapter buckles 2 to the upper crossed ends 3 of a seat strap 4, and lower ends 5 stitched, as at 6, to said seat strap 4 in front of the harness. The numeral 7 designates the usual leg straps which need be merely identified in passing.

**2**

Harness of the type illustrated is adapted to be suspended from the shroud lines 8 of the parachute canopy, not shown, by means of a pair of front and rear riser webs, or straps, at each side of the harness, one of such pairs being shown, as sufficient to a proper understanding of the invention, and designated 9, 10. As will be understood, the riser webs, or straps, 9, 10 are of inelastic material. The pairs of front and rear riser webs, or straps, 9, 10 are connected, at corresponding ends of each pair, to the harness in front thereof at the juncture of the shoulder straps 1 with the ends 3 of the seat strap 4 in a manner which will be understood and is therefore not shown in the drawings. The other ends of said straps 9, 10, or webs, are connected to the shroud lines 8 by ring couples, as at 12, with said ends looped, as at 13, through one of the rings and stitched, as at 14.

According to my invention, a pair of front and rear shock absorbing webs, or straps, 15, 16 is provided for each pair of front and rear riser webs, or straps, 9, 10, and which are shorter relatively than said webs, or straps, 9, 10 and formed of elastic material suitably reactive for a purpose presently seen. The shock absorbing webs, or straps, 15, 16 are connected, at corresponding ends of each pair, to the pairs of front and rear riser webs, or straps, 9, 10 by stitching said ends to said webs, or straps 9, 10, as at 17, in between said riser webs, or straps, and adjacent to the connections 12. The other ends of the shock absorbing webs, or straps, 15, 16 of each pair are connected to the ring couples 12 in the same manner as the front and rear riser webs, or straps, 9, 10, in the loops 13, and secured by the stitches 14.

Referring now to Figure 4, when the parachute is packed and folded, the front and rear riser webs, or straps, 9, 10 of each pair are folded over and lengthwise of the shoulder straps 1, on the same side of the harness, back and forth in loop formation to take up the slack therein caused by said webs, or straps, 9, 10 being longer, normally, than the shock absorbing webs, or straps, 15, 16. The rear riser web, or strap, 10 in each pair is folded to arrange the folds 18 on top of the strap, whereas the front riser web, or strap, 9 is folded to arrange the folds 19 underneath the strap. The shock absorbing webs, or straps, 15, 16 are passed rearwardly between the folds 18, 19 to the canopy or chute pack 20. The folds 18, 19 and said shock absorbing webs, or straps, 15, 16 are temporarily fastened together, or tacked, by tacking cords 21 adapted to break under the pull of

2,462,234

**3**

the canopy, not shown, and load on the canopy, as soon as said canopy begins to open.

The operation of the described invention will be readily understood. As soon as the canopy begins to open, the impact of the jumper against said canopy causes the cords 21 to break and the shock absorbing webs, or straps, 15, 16 stretch under the weight of the load thereon. This breaks and cushions the impact against the canopy and the jumper, gradually, as the canopy opens up and assumes the full load thereon, and until said shock absorbing webs stretch sufficiently for the front and rear pairs of riser webs, or straps, 9. 10 to function in sustaining the full load. When the jumper lands, feet foremost, the reaction of said shock absorbing webs, or straps, 15, 16, or in other words, contraction thereof, tends to pull the canopy downwardly, and hence, the jumper upwardly, so that the jumper is assisted in maintaining erect position in landing.

The foregoing will, it is believed, suffice to impart a clear understanding of my invention without further explanation.

Manifestly, the invention, as described, is susceptible of modification without departing from the inventive concept, and right is herein reserved to such modifications as fall within the scope of the appended claims.

What I claim is:

1. In a parachute, a harness, shroud lines, riser webs connected in pairs at one end to said harness at opposite sides thereof and connected at the other ends thereof to said shroud lines, and elastic shock absorbing webs normally shorter than said riser webs connecting said harness to

**4**

said shrouds and interposed between said pairs of riser web, said riser webs being folded intermediate the ends thereof upon opposite sides of said elastic webs, and pull-apart means connecting the folds of said elastic webs and said riser webs.

2. In a parachute, a harness, shroud lines, riser webs connected in pairs at one end to said harness at opposite sides thereof and connected at the other ends thereof to said shroud lines, and elastic shock absorbing webs normally shorter than said riser webs connecting said harness to said shroud and interposed between said pairs of riser webs, said riser webs being folded intermediate the end thereof upon opposite sides of said elastic webs, and pull-apart means connecting the folds of said elastic webs and said riser webs comprising cord strands extended through said folds and webs.

LEO E. SUPINA.

**REFERENCES CITED**

The following references are of record in the file of this patent:

UNITED STATES PATENTS

| Number | Name | Date |
|---|---|---|
| 1,401,040 | Calthrop | Dec. 20, 1921 |
| 2,336,312 | Strong | Dec. 7, 1943 |

FOREIGN PATENTS

| Number | Country | Date |
|---|---|---|
| 8,649 | Great Britain | 1915 |
| 549,953 | Great Britain | Dec. 15, 1942 |
| 157,230 | Switzerland | May 16, 1933 |

654

Feb. 22, 1949.  L. E. SUPINA  2,462,234

PARACHUTE

Filed Feb. 9, 1946  2 Sheets—Sheet 1

Inventor

Leo E. Supina

By Clarence A. O'Brien

and Harvey B. Jacobson

Attorneys

Feb. 22, 1949.                     L. E. SUPINA                     2,462,234

                                      PARACHUTE

Filed Feb. 9, 1946                                      2 Sheets-Sheet 2

FIG. 4

FIG. 6

FIG. 5

Inventor

Leo E. Supina

Clarence A. O'Brien
and Harvey B. Jacobson
Attorneys